## LEAGUE TO SAVE LAKE TAHOE and Sierra Club, Plaintiffs,

v.

## TAHOE REGIONAL PLANNING AGENCY, Defendant.

### No. CIV. S–08–2828 LKK/GGH.

United States District Court, E.D. California.

Sept. 16, 2010.

Order Denying Motion to Alter Nov. 24, 2010.

Trent William Orr, Trent W. Orr, Wendy Sangbee Park, Earthjustice Legal De-

fense Fund Incorporated, Oakland, CA, for Plaintiffs.

Nicole Ursula Rinke, Tahoe Regional Planning Agency, Stateline, NV, Christine Ann Sproul, CA Dept. of Justice, Office of the Attorney General, Daniel Lawrence Siegel, Office of the California Attorney General, Sacramento, CA, for Defendant.

### ORDER

LAWRENCE K. KARLTON, Senior District Judge.

Development in the Lake Tahoe region is regulated by the Tahoe Regional Planning Agency ("TRPA"). TRPA amended its "shorezone" ordinances on October 22, 2008. Plaintiffs League to Save Lake Tahoe and the Sierra Club challenge these amendments, arguing that in adopting them TRPA violated the Tahoe Regional Planning Compact and the implementing Code of Ordinances.

Pending before the court are cross motions for summary judgment on liability. The California State Lands Commission has filed a brief supporting plaintiffs and the Shorezone Property Owners Association has filed a brief supporting TRPA.

The court resolves the matters on the papers and after oral argument.

### I. Background [1]

#### A. Lake Tahoe

For well over a century, writers have praised Lake Tahoe's beauty. *See Tahoe–Sierra Pres. Council v. TRPA,* 535 U.S. 302, 307, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (quoting Mark Twain, *Roughing It* 174–75 (1872)). For over forty years, government has struggled to preserve this treasure. *Id.* at 308, 122 S.Ct. 1465. With mixed optimism and pessimism, the court expects both the praise and the struggle to continue.

Lake Tahoe is an alpine lake located in the northern Sierra Nevada Mountains and spanning the California–Nevada border. The lake is famous for its exceptional clarity, "which depends largely on the amount of suspended fine sediments and, to a lesser degree, algal productivity." Administrative Record at Volume 7, page 4046 (hereinafter "AR Vol.:Page"). The amount and productivity of algae is in turn largely a function of the amount of nutrients in the water. *Id.* Beginning around the 1960s, human activity in the area be-

1. The facts discussed by the court are undisputed unless otherwise noted. The League, TRPA, and Shorezone Property Owners Association have requested judicial notice of various government documents or decisions. Although review of the challenged decision is made on the administrative record, the submitted documents that predate the decision or constitute aspects of the amended ordinances themselves may supplement the record. No party has objected to judicial notice of the pre-decision documents. All of these exhibits are judicially noticeable within the meaning of Fed.R.Evid. 201.

TRPA and Shorezone Property Owners Association further request judicial notice of documents post-dating the challenged decision, including TRPA's 2009 decision to postpone consideration of pier applications until 2011, TRPA's 2010 Annual Shorezone Program Report dated March 17, 2010, and the

Blue Boating Program Phase II Implementation Plan dated March 24, 2010. Insofar as the instant suit concerns whether TRPA's 2008 decision to adopt the Amendments was supported by the record, these after-the-fact documents have limited relevance, if any. "[I]t is not 'appropriate ... to use post-decision information as a new rationalization either for sustaining or attacking the Agency's decision.'" *Rybachek v. U.S. Envtl. Prot. Agency,* 904 F.2d 1276, 1296 (9th Cir.1990) (quoting *Ass'n of Pac. Fisheries v. Envtl. Prot. Agency,* 615 F.2d 794, 811 (9th Cir.1980)). TRPA suggests that the court consider these exhibits as "events indicating the truth or falsity of agency predictions[, which] should not be ignored." *Amoco Oil Co. v. Envtl. Prot. Agency,* 501 F.2d 722, 729 n. 10 (D.C.Cir.1974). The court declines to adopt this rationale for considering the exhibits.

gan increasing the amount of nutrients and sediments in the lake, initiating what has been a steady decline in water clarity. *Id.*, *see also* AR 11:7313. Although visibility previously extended to over 100 feet below the lake's surface, over 30% of this visibility has been lost. AR 7:4201, 4045, 11:7313.

Water clarity is not the only aspect of the lake to have suffered. The Lake Tahoe Basin has also suffered from degradation of other measures of water and air quality. Many of the aesthetic and recreational values of the region have been impaired, including scenery, noise, and the ability to use the lake for recreational purposes.

A major cause of these declines is development in the basin. Onshore development introduces nutrients and sediment by, among other things, eliminating wetlands and undisturbed lands that filter runoff and by increasing sewer line exfiltration and septic leachate. *See also Tahoe–Sierra Pres. Council*, 535 U.S. at 308, 122 S.Ct. 1465. Piers and other structures that enable boating also impact protected values, such as fish habitat and recreation. AR 6:4007, 7:4173. Separate from the effects of development, emissions from motorized watercraft harm air and water quality, including water clarity.

## B. The Tahoe Regional Compact & TRPA's Regulation

■ Efforts to address these problems have been shaped by the fact that jurisdiction over the Lake Tahoe Basin is shared by the States of California and Nevada, five counties, several municipalities, and the United States Forest Service. *Tahoe–Sierra Pres. Council*, 535 U.S. at 308, 122 S.Ct. 1465. In 1968, the legislatures of the two States adopted the Tahoe Regional Planning Compact, which Congress approved in 1969. In 1980, the initial Compact was amended "to increase the level of environmental protection for the Basin as

a whole." *Tahoe–Sierra Pres. Council, Inc. v. TRPA*, 322 F.3d 1064, 1071 (9th Cir.2003); *see also* 1980 Cal. Stat. ch. 872, p. 2710 § 2 (codified as amended at Cal. Gov't Code § 66801); 1980 Nev. Stat. 1 (codified at Nev. Rev. Stat. 277.200); Act of Dec. 19, 1980, Pub. L. No. 96–551, 94 Stat. 3233. The Compact is "federal law" for purposes of jurisdiction under 28 U.S.C. § 1331 and is interpreted pursuant to federal principles of statutory interpretation. *League to Save Lake Tahoe v. TRPA*, 507 F.2d 517, 525 (9th Cir.1974), *Lake Tahoe Watercraft Rec. Ass'n v. TRPA*, 24 F.Supp.2d 1062, 1068 (E.D.Cal. 1998).

The 1980 Compact (hereinafter "Compact") directed TRPA to develop regional "environmental threshold carrying capacities" Compact art. I(b) and V(b). Environmental threshold carrying capacities ("thresholds") are environmental standards "necessary to maintain a significant scenic, recreational, educational, scientific or natural value of the region or to maintain public health and safety within the region" and "shall include but not be limited to standards for air quality, water quality, soil conservation, vegetation preservation and noise." Compact art. II(I). TRPA has adopted 36 separate threshold standards, including standards for water clarity and quality, air quality, noise levels, recreational access, and scenic quality. *See, e.g.*, AR 29:19179–94 (TRPA Resolution 82–11, as amended) (adopting initial thresholds), AR 11:7207 (discussing thresholds presently in effect).

TRPA must regulate the region in order to achieve these thresholds "while providing opportunities for orderly growth and development consistent with such capacities." Compact art. I(b). One aspect of TRPA's regulation is promulgation of generally-applicable rules and plans. Most broadly, TRPA adopted a Regional Plan in 1987. This document is "a single enforce-

able plan" that includes many correlated elements relating to the regulation of the Basin, including "[a] conservation plan for the preservation, development, utilization, and management of the scenic and other natural resources within the basin." Compact art. V(c)(3). The Regional Plan is implemented by the Code of Ordinances and the Rules of Procedure promulgated by TRPA. *See Comm. for Reasonable Regulation of Lake Tahoe v. TRPA*, 311 F.Supp.2d 972, 979–80 (D.Nev.2004).

TRPA also regulates on a project-specific basis. Before approving any project, TRPA must ensure that the project will not interfere with implementation of the regional plan or cause the thresholds to be exceeded. Compact art. V(g). TRPA must also prepare an environmental impact statement ("EIS") for the project, similar to the reporting required by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA") and the California Environmental Quality Act, CAL. PUB. RES. CODE §§ 21000–21176 ("CEQA"). Compact art. VII(a)(2). A project cannot be approved unless either "changes or alterations" have reduced "the significant adverse environmental effects to a less than significant level" or the agency determines that mitigation is "infeasible." Compact art. VII(d)(1) and (2).

## C. The 2008 Shorezone Amendments

On October 22, 2008, TRPA's governing board adopted the Shorezone Amendments. AR 1:1–3. These Amendments' provisions regarding piers, buoys, and other boating facilities form the core of this case.

Prior to the Amendments, a rule designed to protect fish habitat was the primary limit on construction of boating facilities. Approximately two thirds of the lakeshore was designated as "prime fish habitat," which included habitat needed for spawning, fish feed and cover, or within 200 feet of designated spawning streams. *See* AR 6:3860. In these areas new construction was prohibited and existing structures could only be modified when the modification would "decrease in the extent to which the structure does not comply with the development standards" and would improve attainment or maintenance of threshold standards. *Id.*, AR 3:1884–88.

In the process leading up to the Amendments, TRPA concluded that the above prohibition went beyond what was necessary for fish protection, a conclusion plaintiffs do not challenge here. AR 2:734–62. The Amendments repealed the prohibition on construction in fish habitat, allowing new facilities to be constructed within certain other limits. Most notably, the amended ordinances place numeric caps on the number of boating facilities that can be placed on the lake. The Amendments allow an additional 128 private piers, 10 public piers, 1,862 new mooring buoys, 6 new boat ramps, and 235 boat slips to be constructed or placed within Lake Tahoe's Shorezone. TRPA Amended Code of Ordinances §§ 52.2.B, 52.4.B, 52.5 (hereinafter "Code"). In addition to these "new" facilities, the Amendments allow TRPA to issue permits for buoys that are already on the lake but that are unpermitted; TRPA may also authorize buoys to replace these unpermitted buoys if and when the unpermitted buoys are removed. Compared to the maximum potential build-out under the former rule, the Amendments increase the maximum for piers and buoys but reduce the cap on boat ramps and slips.[2]

---

**2.** Although the prior code of ordinances did not set a numerical limit on boating facilities that could be permitted, TRPA estimated that the spatial prohibition would in effect allow the total numbers (existing plus potential) to rise to 839 piers, 5, 826 buoys, 128 ramps, and 3,144 slips. The Amendments permit a total of 906 piers, 6,316 buoys, 43 ramps, and 2,929 slips. Compare AR 2:734 with 3:1189.

The EIS recognizes that development of boating facilities could negatively impact air and water quality, recreational access, scenery, and noise. The Amendments adopt measures to mitigate these impacts, and the EIS concluded that these measures mitigate impacts to a "less than significant" level. AR 1:1, 78–80. TRPA concluded that as a result of this mitigation, the Amendments satisfy the obligation to maintain and achieve thresholds. AR 1:1, 22–23. Plaintiffs argue that both of these conclusions were arbitrary and capricious. Plaintiffs relatedly argue that the unmitigated impacts will violate the obligation to avoid degradation of the lake as an "Outstanding National Resource Water" under the Clean Water Act.

## II. Standard

The majority of plaintiffs' claims arise under the Compact itself. The Compact provides a private cause of action for suits alleging that TRPA's "act or decision has been arbitrary, capricious or lacking substantial evidentiary support or [that] the agency has failed to proceed in a manner required by law." Art. VI(j)(5); *see also* Code § 6.2A. The parties characterize this standard of review as essentially the same as that employed under the Administrative Procedure Act (*"APA"*). 5 U.S.C. § 706(2)(A), (E); *but see Comm. for Reasonable Regulation of Lake Tahoe,* 311 F.Supp.2d at 989 (discussing the "substantial evidence" aspect of the Compact standard).

As noted above, plaintiffs also argue that TRPA has violated the Clean Water Act's anti-degradation policy for "Outstanding National Resource Waters." The parties have not discussed the cause of action authorizing this claim, but it appears that this claim is brought under the Compact by virtue of the Compact's incorporation of state and federal water quality guidelines. The parties agree that the arbitrary and capricious standard applies to this claim.

■■■ Suits challenging agency action under such standards generally do not present factual disputes, and thus do not implicate the ordinary standards for summary judgment. *Conservation Cong. v. U.S. Forest Serv.,* 555 F.Supp.2d 1093, 1100 (E.D.Cal.2008) (citing *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769–70 (9th Cir.1985)). An agency decision is arbitrary or capricious for purposes of the APA where the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair,* 537 F.3d 981, 987 (9th Cir.2008) (*en banc*) (quotations omitted). The agency "must articulate a rational connection between the facts found and the conclusions reached." *Earth Island Inst. v. U.S. Forest Serv.,* 442 F.3d 1147, 1157 (9th Cir.2006) (citing *Midwater Trawlers Co-op. v. Department of Commerce,* 282 F.3d 710, 716 (9th Cir. 2002)).

This standard is especially appropriate when reviewing factual determinations that implicate an agency's scientific expertise. *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, BLM,* 273 F.3d 1229, 1236 (9th Cir.2001). Even for scientific questions, however, a court must intervene when the agency's determination is counter to the evidence or otherwise unsupported. *See, e.g., Sierra Club v. U.S.*

In this litigation, TRPA and the Shorezone Property Owners argue that because the Amendments limit construction in ways beyond the numeric cap it is unlikely that the full 128 additional private piers will be constructed. The EIS, however, assumes that all 128 piers will be built.

*Envtl. Prot. Agency,* 346 F.3d 955, 962 (9th Cir.2003), *amended by* 352 F.3d 1187 (9th Cir.2003) (rejecting agency's factual conclusion about cause of air quality exceedance).

### III. Analysis

Plaintiffs argue that adoption of the Amendments violated two provisions of the Compact. First, the obligation to ensure that the Code, as amended, implements the Regional Plan in a way that will achieve and maintain the thresholds and second, the obligation to ensure that the Amendments' adverse impacts were mitigated to a "less than significant" level. For the reasons explained below, TRPA's conclusion that the Amendments satisfy these two obligations was arbitrary and capricious.

In a claim that is largely derivative of the above, plaintiffs argue that the Amendments violated the Clean Water Act's anti-degradation policy for Outstanding National Resource Waters. Because TRPA has not shown that the Amendments' water quality impacts will be mitigated, TRPA's conclusion that the Amendments comport with this policy was also arbitrary and capricious.

### A. The Obligation to Achieve and Maintain Thresholds

TRPA's obligation to "achieve and maintain" the environmental thresholds is reiterated throughout the Compact. In particular, TRPA must ensure that "at a minimum, the [Regional Plan] and all its elements, as implemented through agency ordinances, rules and regulations, achieves and maintains" the thresholds. Compact art. V(c); *see also* Code § 6.5. In adopting the Amendments, TRPA concluded that this obligation was satisfied because the project included mitigation measures

that would ensure that the Amendments had no significant adverse effects. AR 1:22–23.[3] As to this, the court states in part III(B) below, the predicate finding that the project would not have significant impacts on air quality, water quality, recreational access, and noise is arbitrary and capricious.

More fundamentally, however, TRPA misunderstands the nature of the obligation to achieve and maintain the thresholds. It is not enough to show that the Amendments do not make the problem worse. TRPA must ensure that the ordinances, as amended, implement the regional plan in a way that will actually achieve the thresholds. With regard to thresholds not presently in attainment, TRPA's finding that the Amendments will not aggravate the problem is inadequate.

#### 1. The "Achieve and Maintain" Obligations

Three provisions of the Compact oblige TRPA to achieve and maintain the thresholds. Article I(b) compels TRPA to "adopt and enforce a regional plan and implementing ordinances which will achieve and maintain [the thresholds] while providing opportunities for orderly growth and development consistent with [them]." Article V(c) provides that once TRPA adopts thresholds, TRPA must "amend the regional plan so that, at a minimum, the plan and all its elements, as implemented through agency ordinances, rules and regulations, achieves and maintains" the thresholds. In light of these provisions, TRPA has adopted an ordinance specifying that before the ordinances, rules, or other programs may be amended, TRPA must find that, *inter alia,* "the Regional Plan and all of its elements, as implemented

---

**3.** The court acknowledges that item 1 of TRPA's "Chapter 6 Findings" regarding the Amendments is ambiguously worded. The court's interpretation of this finding is informed by the position taken by TRPA in its briefing and at oral argument.

through the Code, Rules and other TRPA plans and programs, as amended, achieves and maintains the thresholds." Code § 6.5. Finally, a third provision of the Compact, which applies to "projects" in general rather than specifically to the Regional Plan and ordinances, provides that prior to approving any project, TRPA must conclude that the project "will not adversely affect implementation of the regional plan and will not cause the adopted environmental threshold carrying capacities of the region to be exceeded." Compact art. V(g).

█ Under these provisions, amendments to the ordinances face a higher burden than individual projects. In approving individual projects, article V(g) merely requires that TRPA find that the project will not cause any threshold to be "exceeded." *Id.* A finding that the project will not make matters worse suffices under this standard. Article V(g) applies to amendments *to the ordinances because an amendment is a "project" under the Compact. Id.* art. I(h). Such amendments are also subject to the higher standard under Code § 6.5, however, which requires a finding that "the Regional Plan ..., *as implemented through the Code ... as amended,* achieves and maintains the thresholds." (emphasis added). Section 6.5 explains that this finding is "in addition to" the findings required for projects generally. Where a threshold is not in attainment, a finding that the problem is not getting worse does not satisfy this provision. Nor is it sufficient to find that, metaphorically, the ball is moving forward. By requiring that the Regional Plan be implemented so as to

"achieve," rather than merely "approach," the thresholds, the Compact and Ordinances require a finding that TRPA will make it to the goal. TRPA is correct that Code section 6.5 looks to the entire package of the regional plan, ordinances, *etc.,* rather than to effects specifically attributable to the proposed amendment. Thus, it does not matter whether the proposal at issue will make the scoring shot, or even whether it will be involved in the play. The key is the finding that, one way or another, the thresholds will be achieved.[4]

TRPA argues that this interpretation conflates the requirements of Code sections 6.4 and 6.5. Code section 6.4 provides that before amending the Regional Plan, TRPA must find "that the Regional Plan, as amended, achieves and maintains the thresholds." The Compact and Code recognize that the Regional Plan is not a complete regulatory scheme, as demonstrated by the requirement that TRPA adopt ordinances and regulations in order to implement the plan. *See, e.g.,* Compact art. I(b), VI(a). Thus, the section 6.4 finding is *not* a finding that the Regional Plan, standing in isolation, will suffice to achieve the thresholds. The Regional Plan must be implemented through ordinances, and the details of that implementation matter. In this suit, plaintiffs do not challenge the adequacy of the Regional Plan, implying the view that although the Regional Plan *could* be implemented in a way that would achieve the thresholds, the proposed implementation falls short. Code section 6.5 recognizes the viability of this type of argument by imposing on amendments to

---

4. In an argument raised for the first time in plaintiffs' reply, plaintiffs argue that TRPA's failure to establish "Reasonable Progress Lines" ("RPLs") for the thresholds precludes a finding that the thresholds will be achieved. Pls.' Reply 2–3. It may be that RPLs would facilitate achieving thresholds or determining whether thresholds will be achieved. It may

also be that failure to establish RPLs is itself unlawful. The court does not decide these issues. The court is not persuaded TRPA cannot determine whether the thresholds will be attained without the assistance of RPLs. If plaintiffs wish to challenge the failure to establish RPLs, that is a claim for another lawsuit.

ordinances a requirement that is separate from, but similar to, the requirement for an amendment to the Regional Plan. *See also Cal. ex rel. Van de Kamp v. TRPA*, 766 F.2d 1308, 1314 (9th Cir.1985) (TRPA's finding that project was consistent with the Regional Plan was itself insufficient to satisfy the requirement imposed by Compact art. V(g), notwithstanding TRPA's interpretation of the Compact to the contrary.).

Finally, TRPA argues that this interpretation leads to an absurd result. The language of the Compact and Code is clear in this regard, and a party arguing that the court should depart from the plain language on the basis of absurdity faces a heavy burden. *Pac. Bell Tel. Co. v. Cal. PUC*, 597 F.3d 958, 969 (9th Cir.2010) (citing *Safe Air for Everyone v. Envtl. Prot. Agency*, 488 F.3d 1088, 1097 (9th Cir.2007)), *Cumbie v. Woody Woo, Inc.*, 596 F.3d 577, 582 (9th Cir.2010). TRPA argues that it would be absurd to prevent TRPA from amending the ordinances until all thresholds are in attainment. The court agrees that this would be absurd, but the plain language does not create such a prohibition. Section 6.5 does not require a finding that thresholds have been *achieved*, it requires a finding that the amended ordinances implement the plan in a way that *achieves* them. Many of the thresholds were set for levels ambitiously more protective than then-prevailing conditions, demonstrating a clear understanding that the thresholds would not be imme-diately achieved. AR 29:19179–94. This was consistent with the restorative purpose of the Compact. *See, e.g.*, Compact art. I(a)(7). Thus, TRPA may satisfy section 6.5 by finding that the amended ordinances, *etc.*, implement the Regional Plan in a way that will achieve the thresholds in the future.[5] In light of this clarification, ascribing the plain meaning to "achieves," rather than interpreting the word to mean "moves toward" or something similar, does not produce a result so unworkable as to be absurd.[6]

## 2. TRPA's Findings that The Regional Plan, As Implemented, Would Achieve and Maintain the Thresholds

Having clarified the scope of TRPA's duty, the court turns to the individual thresholds. TRPA has promulgated thirty-six distinct thresholds. *See, e.g.*, AR 11:7207. Twelve of these concern soil conservation, vegetation, fisheries or wildlife, topics on which plaintiffs provide no argument or discussion. Of the remaining twenty-four, many appear to have little connection to motorized boating or boating facilities. These include, for example, thresholds for wood smoke, tributary water quality, water quality in other lakes, and aircraft noise. While plaintiffs refer to some thresholds in this second group in passing, plaintiffs provide no argument regarding the pertinence of these thresholds to this suit. The parties have not ad-

---

**5.** To be meaningful, the obligation to achieve the thresholds must carry with it some requirement of timeliness. The scope of this requirement is not relevant to this suit.

**6.** Although the parties have not briefed the issue, it appears that the States' choice of words was rational. TRPA acknowledges that attainment of the thresholds will require both avoidance of future harm and "repair [of] ongoing environmental damage through restoration projects (correcting the 'sins of the past')." TRPA's Brief at 3. The Shorezone Property Owners' brief demonstrates that one way to correct these sins is by offering new piers as a regulatory 'carrot' that incentivizes landowners to cure unrelated existing damaging conditions. TRPA must have a finite number of such carrots and sticks. Therefore, before changing the way in which TRPA employs these opportunities, TRPA must plan ahead to ensure that the overall effect will attain the thresholds.

dressed whether TRPA must make findings regarding every threshold for every project or amendment, *e.g.*, whether TRPA may amend an aspect of the ordinances dealing with boating without finding that the threshold for onshore impervious coverage of soil is achieved. Because plaintiffs rest their claims on thresholds argued to be affected by boating and boating facilities, the court limits its analysis to those thresholds.

So understood, plaintiffs invoke fourteen thresholds. These are the air quality thresholds for carbon monoxide, ozone, particulates, and atmospheric nutrients; water quality thresholds for winter clarity and phytoplankton; both recreation thresholds; all four scenic thresholds; and noise thresholds for single events and community noise. When the Amendments were adopted, the most recent data on threshold attainment and trends was TRPA's "2006 Threshold Evaluation," dated September 2007. AR 11:7187. This assessment concluded that of these fourteen thresholds, only the two recreation thresholds were in attainment. AR 11:7207.

■■ As noted above, TRPA based its achievement finding on the conclusion that the Amendments would not have significant adverse impacts. AR 1:21–22. For those thresholds that have not been attained, Code § 6.5 requires more, *i.e.*, a showing that something—whether the Amendments or something else—will provide the necessary improvement. TRPA asserts that "TRPA could, if required, find that the Regional Plan attains and achieves [the] thresholds." TRPA Reply, at 4. In review of agency action, a finding

that the agency did not make cannot justify an agency decision, regardless of whether the agency could have made the finding. "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■ If the agency had actually made the requisite finding elsewhere, that finding could have been incorporated by reference. TRPA's decision did not refer to any such finding, AR 1:21–22, and TRPA has not argued that such a finding exists. At most, TRPA points to a resolution that sets target dates for attainment of most thresholds. *See* TRPA's Second Request for Judicial Notice, Ex. 2 (TRPA Resolution 2007–17). Mere setting of targets is not the same as concluding that the agency has adopted a course of action that will meet the targets, and TRPA has not argued that this resolution constituted a determination that the ordinances, *etc.*, as they existed at the time of this resolution would implement the plan so as to achieve the thresholds. Where the court is brought to inquiring whether documents not referred to in the challenged decision implied conclusions that the agency does not attribute to them or any other document, the court has ventured far beyond the bounds of arbitrary and capricious review.[7]

The recreational thresholds, however, present a different question. The court ultimately concludes that TRPA's finding regarding these thresholds was arbitrary and capricious, because the court rejects TRPA's predicate finding that the Amend-

---

7. The court further notes that this resolution did not set a target date for at least one of the thresholds at issue, Dkt. No. 113 at page 33 of 50, ("[t]here is no basis for prediction of a [phytoplankton water quality threshold] attainment date, if attainment is possible."),

and that this resolution appears to conflict in some ways with the concurrently-issued 2006 Threshold Evaluation, *compare id.* at 12 of 50 *with* AR 11:7207 (whether the trend for carbon monoxide levels is positive).

ments would not significantly adversely affect recreation, as explained in part III(B)(3) below. Insofar as the court addresses the recreational impacts as an alternative ground under the counterfactual assumption that the impacts finding was proper, the court cannot reject TRPA's attainment conclusion. The record demonstrates that TRPA concluded that all recreational thresholds were in attainment and that the trend for these thresholds was positive. AR 11:7207. This conclusion was not inconspicuous, although this predicate determination should have been more clearly referenced in the findings adopting the Amendments. Where the threshold has already been attained and is not suffering a downward trend, a finding that the amended ordinances will implement the plan so as to preserve the status quo is all that Code § 6.5 requires.

Accordingly, TRPA arbitrarily and capriciously concluded that the "the Regional Plan and all of its elements, as implemented through the Code, Rules and other TRPA plans and programs, as amended, achieves and maintains" the thresholds for carbon monoxide, ozone, particulates, atmospheric nutrients; winter clarity, phytoplankton, single event noise, community noise, recreation and scenery. Code § 6.5. As to recreation, this holding is predicated on the court's conclusion that TPRA failed to demonstrate that the Amendments would not significantly adversely affect recreation on the lake.

**B. The Obligation to Mitigate Adverse Impacts to a Less Than Significant Level**

The Amendments were a "project" for which the Compact required TRPA to prepare an "environmental impact statement"

("EIS"). Compact art. I(h), VII(a)(2). Pursuant to the EIS requirement, TRPA could not approve the Amendments unless TRPA had "required" or "incorporated" measures "which avoid or reduce the significant adverse environmental effects to a less than significant level" or TPRA found such measures to be infeasible.[8] Compact art. VII(d)(1). There was no finding of infeasibility here.

Plaintiffs contend that for a variety of reasons, TRPA's conclusion that there would be no significant impacts was arbitrary and capricious. The court concludes that TRPA failed to support its conclusions with regard to air, water, recreation, and noise, but the court rejects plaintiffs' challenge to the determination that the Amendments would not significantly adversely affect scenic values.

**1. Challenge to the Baseline**

■ The EIS serves to identify "[t]he significant environmental impacts *of the proposed project*," *i.e.*, the impacts of what the agency proposes to *do*. Compact art. VII(a)(2)(A). Under the Amendments, TRPA proposes to, among other things, issue permits for buoys in excess of those presently on the lake. TRPA separately plans to identify the illegal buoys presently on the lake and either issue permits for those buoys or to remove them while authorizing others buoys to replace them. Plaintiffs argue that the EIS masked the impacts of permitting or replacing unauthorized buoys by including the existence of those buoys in the environmental baseline even though TRPA's plan regarding existing illegal buoys is an aspect of the proposed project. The court agrees.

---

8. The version of the Compact ratified by the states includes the word "than," although the version ratified by Congress does not. As explained in the court's September 18, 2009, 2009 WL 3048739, order issuing a preliminary injunction, the court interprets the compact as written above.

### a. The EIS's Baseline and Treatment of Unauthorized Buoys

In discussing buoys, the EIS begins with the estimate that 4,454 buoys exist on the lake. AR 2:746. An unspecified number of these buoys have not been permitted by TRPA. *Id.* The Amendments approach these buoys as follows:

> TRPA would first recognize all buoys previously permitted by TRPA. Then, those buoys that have been permitted by other agencies with appropriate jurisdiction that meet the TRPA location criteria would be permitted. At this point, all other unpermitted buoys on the lake would be removed, unless the owners can clearly demonstrate their buoys' existence in the Lake prior to 1972. New buoy applications would then be accepted from those littoral owners who did not previously place unpermitted buoys in the lake. No more than 4,454 buoys will be allowed in the lake, until TRPA successfully implements the Blue Boating Program.

*Id.* Although this plan contemplates identification of which buoys are unpermitted (and thus the number of such buoys) the EIS does not do so. Nor has TRPA explained why such identification will be possible in the future but is not in the present.

The "baseline" adopted by the EIS includes the existence of all 4,454 existing buoys. *See, e.g.,* AR 2:773–74.[9] Plaintiffs argue that by incorporating existing unpermitted buoys into the baseline, TRPA proposes to authorize buoys while disregarding the effects of doing so. The EIS calculates the effects of the Amendments by comparing the baseline conditions with the conditions that will result from construction of all structures potentially permitted by the Amendments. AR 2:773–74. This calculation is used to determine the impacts that must be mitigated. *Id.* Thus, while TRPA will issue permits for presently unpermitted buoys or their replacements under the Amendments, the newly-permitted buoys' effects are excluded from the amounts to be mitigated by the Blue Boating and Adaptive Management Programs.

Separate from this baseline, the EIS describes a "no-action" alternative under which TRPA would permit the maximum number of buoys available under the prior version of the ordinances (*i.e.,* under the prohibition on development in prime fish habitat). AR 2:680 (2008 EIS). At least some CEQA cases have endorsed the practice of describing both existing conditions and likely future conditions under existing policy. *See, e.g., Woodward Park Homeowners Ass'n, Inc. v. City of Fresno,* 150 Cal.App.4th 683, 714, 58 Cal.Rptr.3d 102 (2007). Here, under the EIS's no-action alternative the number of buoys on the lake would rise to 5,826. AR 3:1889. The EIS appears not to have used this no-action alternative in assessing the effects of the Amendments. The parties have not directly addressed the propriety of this no-action alternative or the distinction drawn between it and the baseline.

### b. Whether the Baseline Was Appropriate

■ The court is not aware of any other case addressing a challenge to the baseline used in an EIS prepared under the Compact. In arguing over the propriety of the baseline here, the parties cite a range of

---

9. The EIS explains that it used 2002 in setting the baseline of 4,454 existing buoys. AR 2:746. It is unclear which year TRPA used for the baseline for other facilities. For example, in discussing boat emissions in the Oct. 2008 Addendum to the EIS, TRPA inconsistently refers to 2002 and 2004 as representing the baseline. *Compare* AR 2:773 *with* AR 2:774. No party has explained this difference or argued that it demonstrates any separate impropriety.

cases, primarily interpreting CEQA and NEPA. To the extent that these cases apply here, they support the conclusion that approval of unauthorized buoys or their replacements is an aspect of the agency action and that inclusion of existing unauthorized buoys in the baseline impermissibly obscured this action's effects.[10]

■ Before turning to the cases, the court notes two governing principles of statutory interpretation. First, cases interpreting other statutes inform interpretation of the Compact only where those cases rest on language analogous to that used in the Compact. *Glenbrook Homeowners Ass'n v. TRPA*, 425 F.3d 611, 615–16 (9th Cir.2005) (citing *Yates v. United States*, 354 U.S. 298, 309, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957)) (explaining that NEPA regulations do not apply to the Compact). Second, statutes must be interpreted in light of their context. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 665, 127 S.Ct. 2518, 2534, 168 L.Ed.2d 467 (2007). This context includes both the overall statutory scheme, *id.*, as well as the statute's purpose, *see, e.g., Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 699, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995), *Cmtys. for a Better Env't v. City of Richmond*, 184 Cal.App.4th 70, 89, 108 Cal.Rptr.3d 478 (2010) (citing *Cmtys. for a Better Env't v. S. Coast Air Quality Mgmt. Dist.*, 48 Cal.4th 310, 328, 106 Cal.Rptr.3d 502, 226 P.3d 985 (2010)).[11] With these principles in mind, the court turns to the cases cited by the parties.

The Compact requires that the EIS identify the effects of the action. A "practical requirement" of this type of review is identification of "baseline conditions ... against which to compare predictions of the effects of the proposed action." *Am. Rivers v. Fed. Energy Reg. Comm'n*, 201 F.3d 1186, 1195 n. 15 (9th Cir.1999) (quotation omitted). CEQA also requires that action be measured against a baseline, also referred to as the "environmental setting." *Cmtys. for a Better Env't*, 48 Cal.4th at 320, 106 Cal.Rptr.3d 502, 226 P.3d 985.

Many CEQA cases have held that where the existing legal framework (whether a license, plan, *etc.*) would permit development or activity in excess of actual physical conditions, physical conditions must be used as the baseline. First in this line of cases is *Environmental Planning & Information Council v. County of El Dorado*, 131 Cal.App.3d 350, 358, 182 Cal.Rptr. 317 (1982). In *El Dorado*, the proposed project would have authorized development at a level greatly in excess of that then existing but below the amount authorized by the prior general plan. *Id.* The county used the general plan as the baseline, giving the impression that the plan would reduce development. *Id.* In deciding whether this was permissible, the court noted that the purpose of environmental review under CEQA was "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment" and, more generally, "to afford the fullest possible protection to the

**10.** The statutes themselves are inapplicable. TRPA is not a federal agency and therefore not subject to NEPA. *Glenbrook Homeowners Ass'n v. TRPA*, 425 F.3d 611, 615 (9th Cir. 2005). Although plaintiffs' complaint alleged that CEQA directly applies to TRPA's actions in California, in the present motions plaintiffs do not assert this theory of liability. *See* Compl. ¶ 70 (citing *California Dep't of Transp.*

*v. City of South Lake Tahoe*, 466 F.Supp. 527, 537 (E.D.Cal.1978)).

**11.** The court uses *"Communities for a Better Environment"* to refer to the California Supreme Court's decision at 48 Cal.4th 310, 106 Cal.Rptr.3d 502, 226 P.3d 985 (2010), rather than the California Court of Appeal's decision at 184 Cal.App.4th 70, 108 Cal.Rptr.3d 478.

environment within the reasonable scope of the statutory language." *Id.* at 354–55, 182 Cal.Rptr. 317. From this perspective, the court rejected use of the prior plan as the baseline, as this could "only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts that would result." *Id.* at 358, 182 Cal.Rptr. 317. *El Dorado* was later used as the basis for a CEQA guideline, which provides that the baseline will "normally" be "the physical environmental conditions … as they exist … at the time environmental analysis is commenced." CAL.CODE REGS., tit. 14, § 15125(a). The California Supreme Court recently affirmed this line of cases and their use of this guideline in *Communities for a Better Environment.* There, a refinery had licenses to operate four boilers, each specifying a maximum operating level. 48 Cal.4th at 322, 106 Cal.Rptr.3d 502, 226 P.3d 985. Although these licenses in principle authorized all four boilers to simultaneously operate at maximum capacity, this never occurred in practice. *Id.* Instead, no boiler operated at the maximum level unless one or more other boilers had been shut down for maintenance. *Id.* The Court overturned an EIR that used the legally authorized but never realized limit, rather than actual practice, as the environmental baseline. "An approach using hypothetical allowable conditions as the baseline results in 'illusory' comparisons that 'can only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts,' a result at direct odds with CEQA's intent." *Id.* (quoting *El Dorado,* 131 Cal.App.3d at 358, 182 Cal.Rptr. 317 (1982)).

*Communities for a Better Environment* recognized that three California cases have allowed this sword to cut the other way. *Id.* at 321 n. 7, 106 Cal.Rptr.3d 502, 226 P.3d 985 (citing *Eureka Citizens for Responsible Gov't v. City of Eureka,* 147 Cal. App.4th 357, 54 Cal.Rptr.3d 485 (2007), *Fat v. County of Sacramento,* 97 Cal. App.4th 1270, 119 Cal.Rptr.2d 402 (2002), *Riverwatch v. County of San Diego,* 76 Cal.App.4th 1428, 91 Cal.Rptr.2d 322 (1999)). As characterized by the Court, the Courts of Appeal in these cases had held that physical conditions would "ordinarily" serve as the baseline even "where actual development or activity had, by the time CEQA analysis was begun, already exceeded that allowed under existing regulations." *Id.* at 321, 106 Cal.Rptr.3d 502, 226 P.3d 985. As explained above, the issue in *Communities for a Better Environment* was the converse scenario, which implicated separate concerns. The Court's analysis merely recognized these opinions in passing without endorsing them.

In this case, TRPA primarily relies on *Fat.* In *Fat,* an airport had operated without permits for decades. In reviewing a permit for an expansion, the county used the airport's existing but unauthorized condition as the baseline. *Id.* at 1278, 119 Cal.Rptr.2d 402. The court upheld this baseline, resting primarily on the ground that it complied with the guideline. *Id.* at 1280–81, 119 Cal.Rptr.2d 402. Insofar as Fat simply rested on the text of the guideline, *Fat* carries little weight here.

What *Fat* did not discuss was the fact that *sub silentio* approval of existing unauthorized activity is in an important sense an agency action. The Ninth Circuit has recognized this principle under NEPA. *Friends of Yosemite Valley v. Scarlett,* 439 F.Supp.2d 1074, 1105 (E.D.Cal.2006) ("*Scarlett*"), aff'd by *Friends of Yosemite Valley v. Kempthorne,* 520 F.3d 1024 (9th Cir.2008) ("*Friends*"). In *Friends,* as with many NEPA cases, the baseline was expressed as the "no-action" alternative. 520 F.3d at 1038 (using these terms interchangeably). The EIS was invalid because every alternative it considered, including

the no-action alternative, assumed the existence of projects that required agency authorization but that the agency had not yet validly authorized. *Id.* at 1037–38. The agency had previously authorized these projects, but that authorization had been validated prior to preparation of the EIS. *Id.* at 1030. The District Court observed that by the time the EIS at issue was prepared many of these projects had already been implemented and that "it would be contrary to NEPA to pretend that [these projects were] not now part of the status quo." *Scarlett,* 439 F.Supp.2d at 1105. Nonetheless, because the projects had not been authorized and the project at issue concerned, in part, whether to authorize them, including these projects in the baseline wrongfully " 'assume[d] the existence of the very plan being proposed.' " *Friends,* 520 F.3d at 1038 (quoting *Scarlett,* 439 F.Supp.2d at 1105).

The concern in *Friends* is particularly relevant to the Compact. Like CEQA and NEPA, the Compact serves to inform the public and to protect the environment in a general sense. The Compact goes further, however, by commanding TRPA to improve environmental quality, in some instances dramatically, by setting and attaining environmental thresholds. Removing unauthorized buoys without authorizing replacements would apparently be one way to make progress toward attainment of these thresholds. Forfeiture of that opportunity is an action, rather than a perpetuation of the status quo. Put differently, an agency may not escape its duty by ignoring that duty and then presenting the result as a *fait accompli* incorporated into an environmental baseline. *See Swan View Coalition v. Barbouletos,* No. 6–73–

M, 2008 WL 5682094, *16, 2008 U.S. Dist. LEXIS 56677 *45–46 (D.Mont.2008) (taking this view with respect to an analogous baseline issue under section 7 of the Endangered Species Act, 16 U.S.C. § 1536).

This is not to say that the EIS should ignore the existing effects of unauthorized action. *Scarlett* properly recognized that damage resulting from existing but unauthorized projects must be acknowledged in the EIS. Similarly, where the Bureau of Land Management ("BLM") had allowed an illegal off-highway vehicle trail network to develop over a period of decades, a Northern District of California case held that using conditions as they existed in 1980 as the baseline, as plaintiffs there recommended, would violate NEPA's purpose of providing complete and accurate information about the effects of agency action. *Ctr. for Biological Diversity v. U.S. BLM,* No. C 06–4884, 746 F.Supp.2d 1055, 1090–92, 2009 WL 7036134, *29–30 (N.D.Cal. Sept. 28, 2009) ("*CBD v. BLM* ").[12] Similarly, California courts have suggested that it would be problematic to exclude unauthorized activity by using conditions as they existed in the past as the baseline. *Riverwatch,* 76 Cal. App.4th at 1453, 91 Cal.Rptr.2d 322 (discussing "early baselines"). It appears to the court, however, that a baseline may reflect damage that has already occurred as a result of illegal activity as well as the agency's present ability and responsibility to limit perpetuation of that harm through enforcement.

Two remaining California decisions have upheld use of a baseline reflecting existing unauthorized activity, resting on concerns that are inapplicable here. In

---

**12.** *CBD v. BLM* held that enforcement after decades of inaction was itself an agency action, upholding BLM's use of a baseline that included continued use of at least some unauthorized roads. 746 F.Supp.2d at 1090–92, 2009 WL 7036134, *29–30. Although *CBD v. BLM* is a well-reasoned opinion, for the reasons stated above the court does not find this particular ground for decision persuasive in this case.

the first, *Riverwatch,* plaintiffs argued that the baseline should have excluded the effects of past illegal land disturbance. 76 Cal.App.4th at 1452, 91 Cal.Rptr.2d 322. The court rested on the county's conclusion that requiring the county to determine whether these disturbances were legal, as a prerequisite to determining whether to exclude them, would "interfere [with], conflict [with,] or unfairly amplify" the enforcement actions already undertaken by the Army Corps of Engineers, the entity with jurisdiction over the issue. *Id.* at 1453, 91 Cal.Rptr.2d 322. The second, *Eureka Citizens for Responsible Gov't,* 147 Cal.App.4th 357, 54 Cal.Rptr.3d 485, rested on *Riverwatch* and the language of the guidelines to hold that even where the agency preparing the EIR is the enforcement agency, addressing prior illegality through the EIR process could interfere with enforcement efforts. 147 Cal.App.4th at 370–71, 54 Cal.Rptr.3d 485. In this case, TRPA has not argued that determining the number of unauthorized buoys at this stage would interfere with subsequent enforcement. Because enforcement action regarding all unauthorized buoys is an aspect of the very project under consideration here, such interference appears unlikely. Nor has TRPA argued that information necessary to identify the number of unauthorized buoys is unavailable. *C.f. CBD v. BLM,* 746 F.Supp.2d at 1090–92, 2009 WL 7036134, *29–30 (explaining that records necessary to determine which roads were illegal did not exist).

Finally, the facts of the project here are in an important way distinct from those in any of the cited cases. In each of the above cases, the issue was whether the agency could let sleeping dogs lie. Here, TRPA proposes to act on its existing duty to enforce permit requirements, to issue permits to only those existing buoys that can otherwise be lawfully permitted, and to remove the remaining buoys only to permit other unrelated buoys in their place.

For these reasons, the court concludes that the EIS's use of the number of existing buoys, rather than the number of existing buoys authorized by TRPA, as the baseline, was contrary to the Compact and therefore arbitrary and capricious.[13]

Because TRPA calculated the effects of the action by reference to this baseline, this error infects much of the entire EIS. For example, TRPA's conclusion that the effects on air and water quality would be mitigated to the point of insignificance was based on an incorrect calculation of the magnitude of those effects. Use of the inappropriate baseline therefore invalidates the EIS's analysis of air quality, water quality, and noise.[14] In order to guide TRPA on remand, and in light of the possibility of appeal, the court addresses the merits of plaintiffs' independent arguments challenging the EIS. In order to do so the court assumes, contrary to the above conclusion, that the EIS used a permissible baseline.

13. Alternatively, in light of the above concerns and TRPA's failure to identify any discussion in the EIS of why this baseline was chosen, the baseline is arbitrary and capricious in light of TRPA's failure to consider an important aspect of the problem and to articulate a rational connection between the facts found and conclusions reached. *McNair,* 537 F.3d at 987, *Earth Island Inst.,* 442 F.3d at 1157.

14. The baseline error does not appear to pertain to scenery or recreation. The EIS concluded that additional buoys could impact scenic values, but plaintiffs have neither challenged the EIS's conclusion that these impacts would be mitigated nor asserted that the baseline error implicates the scenery analysis. Because the recreation analysis did not discuss buoys in any detail, the baseline error with respect to buoys is not itself a ground for rejecting the recreation analysis.

## 2. TRPA's Finding that Impacts on Air and Water Quality Would Be Less than Significant

Independent of their challenge to the baseline, plaintiffs argue that the EIS's discussion of mitigation is inadequate. The court summarizes the EIS's calculation of air and water quality impacts and the adopted mitigation thereof. The court then addresses the sufficiency of this mitigation from the NEPA perspective. Although the NEPA caselaw generally corresponds with the CEQA standards, the court separately addresses TRPA's contention that under CEQA, an agency may offer a commitment to achieving specific performance standards in lieu of other discussion of mitigation. The court concludes that TRPA has misinterpreted the CEQA caselaw and that the EIS is inadequate whether viewed from the CEQA or NEPA perspective. Accordingly, the court does not address whether the Compact's EIS provision, when interpreted in light of the Compact's extensive substantive requirements, imposes requirements beyond those imposed by CEQA or NEPA with respect to this issue.

### a. Potential Impacts on Air and Water Quality

The EIS asserts that construction of boating facilities authorized by the Amendments will induce additional motorized boating and that emissions from this boating will, if unmitigated, adversely affect air and water quality.[15]

The EIS provides numeric estimates of these impacts. In deriving these estimates, the EIS first estimates that once the maximum number of facilities permitted by the Amendments is constructed there will be 294,895 motorized "boat trips" each year, an increase of approximately 62,686 annual trips over the baseline. AR 2:774. The EIS acknowledges that the rate at which these trips are added will not be uniform, but explains that averaged over the time it will take for new facilities to be constructed, every year there will be 2,850 more boat trips than there were in the year prior. *Id.* Absent mitigation, these 62,686 additional boat trips will impair water quality by annually depositing into the lake an additional 177 tons of hydrocarbons, 318 tons of nitrous oxides, 0.046 tons of polycyclic aromatic hydrocarbons, and 7.8 tons of particulate matter. AR 2:774. These trips will similarly impact air quality by annually emitting into the atmosphere an additional 17 tons of nitrous oxides, 51 tons of reactive organic gasses, 4 tons of particulate matter, and 400 tons of carbon monoxide. AR 7:789.[16] Plaintiffs do not challenge the propriety of these estimates. Pls.' Statement of Undisputed Facts ("SUF") ¶ 25.

The EIS asserts that even if no further boating facilities were approved the number of annual motorized boat trips would nonetheless increase. AR 2:774, 788. This "background" growth is included in the estimates above. AR 2:774. TRPA now argues that because this background growth is not attributable to the effects of the project, the above figures do not represent the project's impacts. TRPA'S Response to Pls.' SUF, ¶¶ 25c, 25e. The court disregards this argument as contrary to the EIS's stated position. The EIS acknowledged this issue, incorporated this background growth into the numeric values anyway, and explicitly stated that

---

15. The EIS acknowledges that other aspects of the Shorezone Amendments, such as dredging and effects of development in the backshore, will also impact air and water quality. AR 2:774, 779. Plaintiffs' present motion does not challenge the EIS with regard to these impacts or mitigation thereof.

16. Some pollutants appear on both lists because boats emit these pollutants directly into both the air and water. AR 7:787.

those values represented the impacts that the project was required to address, avoid, or mitigate. AR 2:773–74.[17] The EIS expresses this requirement by stating that for each year, TRPA must avoid or mitigate the emissions resulting from that year's expected increase in boating. *Id.*

### b. Proposed Measures to Avoid and Reduce Air and Water Quality Impacts

The EIS concludes that the above impacts of motorized boating will be mitigated by the Blue Boating Program and by increased enforcement—funded by buoy fees—of existing "no wake" zones and a 7 mph boating speed limit in the Emerald Bay region of the lake. AR 2:775–77, 788–91, *see also* Code §§ 54.13.2, 54.14. These programs will be implemented and refined pursuant to the Shorezone Adaptive Management Program. Code § 54.16.

TRPA primarily relies on the Blue Boating Program, which the Amendments establish under Code § 54.15. TRPA summarizes this program as involving four elements pertinent to air and water quality, which invoke a mixture of regulatory tools. First, the Blue Boating Program will impose substantive requirements on engine tuning, bilge water, and sewage management. Code §§ 54.15.A(2), (4)-(5). The Amendments call for the creation of "programs" that will impose these requirements but do not describe the requirements themselves. Second, the Blue Boating Program calls for a "mitigation fee program" to be used to "implement additional pollution control measures." Code § 54.15.A(7). The third element is a "boat certification program," which will implement the first two elements. The certification program will "requir[e] operators of motorized watercraft ... to certify compliance with Blue Boating Program require-

ments through a registration and sticker program." Code § 54.15.A(1). Operators will be required to purchase these stickers, with the fee for any boat's sticker to be calculated under "an engine rating system designed to promote use of cleaner engines." *Id.* Thus, the sticker program provides an incentive for boaters to limit their impacts and also provides fees for other mitigation programs. Fourth and finally, the Blue Boating Program calls for water quality monitoring, education, and enforcement programs that will implement the above. Code §§ 54.14.A(6), (8)-(9).

The EIS and other documents included in the administrative record provide few additional details regarding the Blue Boating Program. A "Blue Boating Fact Sheet" incorporated in the EIS proposes a preliminary schedule of sticker fees based on engine horsepower and estimates that the sticker fees will initially generate $570,000 annually, of which an estimated $400,000 will be available for mitigation efforts. AR 2:829, 831. TRPA has not identified any discussion in the record, however, of particular potential mitigation efforts. The engine tuning requirement will require that engines be tuned to reduce emissions as appropriate to the lake's elevation without explaining what this involves. AR 2:830. The sewage management program will involve prohibiting sewage discharge, informing boaters of this prohibition, and providing free alternative sewage disposal at marinas. *Id.* The clean bilge program will impose unspecified bilge water requirements and provide boaters with sponges to absorb contaminants. *Id.*

The Amendments and EIS acknowledge that the Blue Boating Program is incomplete, and the Amendments provide a

---

17. Alternatively, if the court were to accept TRPA's litigation position and conclude that the figures did not state the effects of the action, the EIS would be invalid for failing to provide a statement of those effects.

schedule for implementation. TRPA's executive director must present a plan for implementation of the Blue Boating Program by March 2009 and TRPA's governing board ("Board") must adopt an implementation plan by March 31, 2010. Code § 54.15.B(1). If the Board does not adopt a plan on that date, TRPA may not "accept for processing any new application for an additional pier, boat lift, buoy, boat slip, or boat ramp, or for the expansion of an existing pier." Code § 54.15.B(3). All motorized watercraft are prohibited from operating on the lake after May 1, 2010, unless the boat has obtained a sticker under the Blue Boating Program. Code § 54.15.B(2).[18] Finally, TRPA is prohibited from issuing permits for buoys beyond the 4,454 included in the baseline until the Blue Boating Program is in place. Code § 54.4.F(1). Separate from the schedule provided in the Amendments themselves, the EIS explains that the first step in the implementation of the Blue Boating Program will be to inventory all boats entering the lake and that completion of the Blue Boating Program will be integrated into the process for calculating the Total Maximum Daily Loads for pollutants under the Clean Water Act. AR 2:828–31.

Separate from the Blue Boating Program, the EIS states that air and water quality emissions from motorized boating will be reduced using the $175 annual fee levied on each buoy. AR 3:1950. The final EIS stated that half of these fees will fund watercraft and buoy compliance and monitoring, thirty percent will fund water quality monitoring, and the remaining twenty percent will go to "Shoreland scenic improvement projects on public lands." AR 2:867–68, c.f. AR 3:1950. One component of the watercraft compliance will be increased enforcement of existing "no wake" zones and a low speed limit in the

Emerald Bay portion of the lake. AR 2:756. The EIS explained that this would lessen impacts because emissions are decreased when boats operate at lower speeds. AR 3:1956, 6:3656.

Finally, all mitigation programs are subject to review and revision pursuant to the Shorezone Adaptive Management Program. Code § 54.16. The core of this program is the requirement that TRPA annually consider the prior year's activity and the effectiveness of mitigation in that year. Code § 54.16.B, TRPA's Brief at 8. This includes monitoring whether projects were implemented as permitted, whether actions have had their predicted effects, and whether any larger trends are occurring. AR 2:882. If the "impacts of the new shorezone projects and any attendant increases in motorized watercraft traffic" have not been mitigated, TRPA's executive director must recommend that TRPA's governing board take supplemental measures to ensure full mitigation, including but not limited to:

(1) A moratorium on further approval of shorezone projects.

(2) Modification of the criteria for approval of shorezone projects.

(3) A limitation on boat launches at peak times or other restrictions on motorized watercraft traffic.

(4) A prohibition of lower-rated watercraft engines.

Code § 54.16.C. Separately, beginning March 31, 2012, if the annual report determines that the "performance measures identified in the [EIS]" have not been attained then a moratorium on approvals of boating facilities will automatically be imposed, unless the failure to achieve the performance measure "is not attributable to the approval of new shorezone projects,

---

**18.** For the reasons stated in note 1, supra, the court does not address whether implementation has in fact proceeded according to this schedule.

and all environmental impacts of those projects have been fully mitigated." Code § 54.16.D.[19]

The Shorezone Property Owners argue that aspects of the Amendments not directly related to boating provide still further mitigation of the impacts of boating facilities and motorized boating. For example, the Shorezone Property Owners point to regulations imposed on shorezone properties aimed at eliminating preventable runoff within the shorezone in order to improve the lake's water clarity. *See* Code § 54.4.C (requiring implementation of Best Management Practices), § 52.2.2(e) (a property is eligible for a new pier only if it has complied with said practices). The EIS did not, however, refer to any of these programs or their benefits as potentially offsetting the effects of boating and boating facilities. "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 50, 103 S.Ct. 2856. Because TRPA did not identify these additional measures as pertinent to the question of whether increased boating would have adverse environmental impacts, the court does not decide whether TRPA could have adopted the Shorezone Property Owners' approach.

c. **Whether TRPA's Finding of No Significant Impacts on Air and Water Quality Was Arbitrary or Capricious**

The EIS concluded that the above mitigation measures satisfied the Compact's requirement that "the significant adverse environmental effects" on increased boating on air and water quality be reduced "to a less than significant level." Compact art. VII(d)(1). In closely related arguments, plaintiffs argue that the mitigation measures are so indefinite that it was arbitrary and capricious to conclude that the measures would have this effect and that the EIS improperly relies on mitigation measures that will be imposed after the harm has occurred.

■■■■ The parties cite an extensive range of NEPA and CEQA cases regarding requirements for discussion of mitigation under those statutes. After reviewing these lines of authority, the court concludes that their requirements are equivalent for purposes of the dispute here. Because TRPA did not conclude that mitigation was infeasible, the Compact required "written findings" that "changes or alterations" will "avoid or reduce" environmental harm to insignificance, and these findings "must be supported by substantial evidence." Compact art. VII(d)(1). This obligation requires, at a minimum, a "reasonably complete" discussion of mitigation measures including "analytical data" regarding whether the available measures would achieve the required result. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 352, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), *Sierra Club v. Bosworth,* 510 F.3d 1016, 1029 (9th Cir. 2007). TRPA failed to provide such a discussion here.

i. **NEPA's Requirements for Discussion of Mitigation**

Unlike the Compact, NEPA does not compel avoidance of environmental harm. Nonetheless, discussion of mitigation occurs in two NEPA contexts. Most prominently, an EIS prepared under NEPA

---

19. Section 54.16.C refers to whether the effects have been fully mitigated, whereas § 54.16.D refers specifically to "performance measures." It appears that the performance measures include surrogates for environmental harm that is difficult to measure directly. AR 3:1835–41, 7:4215–16. No party has briefed the relationship between sections C and D, but the details of this relationship do not appear pertinent to this case.

must discuss possibilities for mitigation. *Methow Valley*, 490 U.S. at 352, 109 S.Ct. 1835. *Methow Valley* found this obligation to be inherent in 42 U.S.C. § 4332(2)(C)(ii), which requires a detailed statement of "any adverse environmental effects which cannot be avoided should the proposal be implemented." The Compact uses essentially identical language in Article VII(a)(2)(B). Separately, an agency may discuss mitigation as part of a "Finding of No Significant Impact" ("FONSI"). An agency may prepare a FONSI in lieu of an EIS where proposed action will not have significant effects on the environment. *See Bosworth*, 510 F.3d at 1018; 40 C.F.R. § 1508.9. A FONSI may issue where the project inherently imposes no significant effects or where the project's effects will be mitigated to an insignificant level. *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1121 (9th Cir.2000); *Friends of Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir.1993).

As a threshold issue, although the parties suggest that the EIS and FONSI lines of cases impose differing standards on mitigation discussions, it is not clear that this is so. For example, *Methow Valley* articulated the requirements for discussion of mitigation in an EIS. 490 U.S. at 352, 109 S.Ct. 1835. In *Wetlands Action Network*, the court held that mitigation measures adopted in support of a FONSI were sufficient, resting this conclusion in part on the fact that the mitigation plan satisfied *Methow Valley*. 222 F.3d at 1121–22. The parties here have not identified any clear distinction between the standards imposed in these two contexts.[20]

Under NEPA, discussion of mitigation must be "reasonably complete" and de-tailed enough to "ensure that environmental consequences have been fairly evaluated." *Methow Valley*, 490 U.S. at 352, 109 S.Ct. 1835. Even in the FONSI context, where the agency not only describes but implements mitigation, "the agency is not required to develop a complete mitigation plan detailing the 'precise nature of the mitigation measures,' [although] the proposed mitigation measures must be 'developed to a reasonable degree.'" *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir.2001) (quoting *Wetlands Action Network*, 222 F.3d at 1121), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, — U.S. ——, ——, 130 S.Ct. 2743, 2757, 177 L.Ed.2d 461 (2010).

A necessary aspect of a "reasonably complete" discussion is an assessment of the efficacy of the mitigation measures considered. *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1381 (9th Cir.1998). *Neighbors of Cuddy Mountain* held that an EIS was inadequate because, among other things, it did not "provide[ ] an estimate of how effective the [discussed] mitigation measures would be if adopted, or give[ ] a reasoned explanation as to why such an estimate is not possible." *Id.* The Ninth Circuit has repeatedly held that NEPA requires "analytical data" describing mitigation's effectiveness. *Bosworth*, 510 F.3d at 1029, *League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1192 (9th Cir.2002), *Babbitt*, 241 F.3d at 734, *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1151 (9th Cir.1998). "A perfunctory description or mere listing of mitigation measures, without supporting analytical data," is inadequate. *Babbitt*, 241 F.3d at 734 (internal quotations omitted).

**20.** If, contrary to this court's understanding, the EIS and FONSI cases diverge, it is the latter that have greater relevance to the Compact. Issuance of a mitigated FONSI, like the Compact, requires not only that mitigation be discussed but also that mitigation be sufficient to reduce impacts to insignificance.

Even where the precise contours of the proposed action had not yet been determined, EIS's upheld by the Ninth Circuit discussed the effectiveness of particular mitigation measures. *N. Alaska Envtl. Ctr. v. Kempthorne,* 457 F.3d 969, 979 (9th Cir.2006) concerned lease of federal lands for oil exploration and drilling. Because the precise location of drilling could not yet be determined, the EIS's discussion of mitigation was necessarily general rather than site-specific. *Id.* at 973, 979. Nonetheless, BLM's mitigation analysis discussed a range of mitigating requirements, procedures, practices and design features that could be incorporated into the leases, including a discussion of the effectiveness of each of these options. *Id.* at 979. *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468 (9th Cir.2000) concerned a proposed mine whose precise water quality impacts were uncertain. The EIS's "mitigating measures [were] described in general terms and rel[ied] on general processes, not on specific substantive requirements." *Id.* at·477. The EIS nonetheless included an extensive discussion of specific measures that could be used to mitigate each potential impact, *id.* at 474–75, including an evaluation of the probable effectiveness of each measure, *id.* at 474, 477.

Here, the EIS's discussion of mitigation violates this standard. Beginning with the Blue Boating Program, TRPA has not directed the court to any discussion of the potential efficacy of any of the program's elements, much less any "analytical data" on this issue. Even more glaring, although TRPA represents that a significant aspect of the Blue Boating Program will be the use of sticker fees to fund further mitigation measures, the EIS is silent as

to how this money might be spent.[21] TRPA cannot blindly assume that money will solve its problems. There is no discussion of the types of projects that could be funded, of the benefits such projects might provide, or of whether the funding projected to be available under the sticker program will be sufficient to fund the needed mitigation.

The buoy fee program, unlike the sticker fee program, at least includes some discussion of how fees may be spent. A portion of fees will be used to fund watercraft enforcement, including speed limits in Emerald Bay and the no-wake zone. The EIS contains some analytic data regarding the amount by which an individual boat's emissions are reduced when the boat operates at a reduced speed. AR 3:1956, 6:3656. The mere inclusion of some quantitative data, however, does not render the discussion of mitigation measures sufficient. The EIS does not discuss the ultimate issue, the amount by which aggregate emissions could be reduced by increased enforcement. It appears that any such discussion would require some mention of what fraction of boating occurs in the areas subject to these limits [22] and the number of boats presently operating in violation of these limits, issues on which the EIS is silent. Because the EIS contains no discussion of whether and how the Blue Boating Program and buoy fees will suffice to offset the air and water quality impacts of increased boating, the EIS failed to take the "hard look" required under NEPA. *Methow Valley,* 490 U.S. at 350, 109 S.Ct. 1835.

The Adaptive Management Program does not fill these gaps. Although the Adaptive Management Program lists various measures that would presumably re-

---

**21.** The most detailed statement cited by TRPA is that sticker fees might fund "strategies … includ[ing] particulate matter as well as aquatic invasive species." AR 2:830–31.

**22.** Because the speed limit is imposed only in Emerald Bay it appears the speed limit and no wake zone encompass a small fraction of the lake.

duce environmental impacts, the description of these measures in the Code is a "perfunctory description or mere listing of mitigation measures[ ] without supporting analytical data." *Babbitt,* 241 F.3d at 734. TRPA has not identified any further discussion of these measures elsewhere in the EIS.

TRPA's conclusion that adaptive management is a sound policy particularly suited to management of the Lake Tahoe region appears well reasoned and prudent, and is entitled to deference. Nonetheless, the Compact requires both that TRPA mitigate the project's effects and that TRPA provide an EIS discussing the measures TRPA will use to do so. In light of these obligations, TRPA must implement adaptive management by providing in the EIS a proposal for mitigation that is already reasonably complete but that will be subject to later adaptation. Principles of adaptive management support leaving open the possibility, recognized in the NEPA caselaw, of a future change in mitigation strategy, but adaptive management does not provide a justification for postponing altogether the discussion of mitigation measures. The court therefore rejects TRPA's argument that

the EIS complies with the Compact because TRPA will "go slow" to ensure that mitigation measures are developed and implemented before harm occurs. Even assuming that this approach will avoid harm, it deprives the public of the opportunity to meaningfully comment on mitigation measures prior to the project's approval.[23]

### ii. Whether The Mitigation of Air and Water Quality Impacts Satisfies CEQA

Like the Compact, CEQA requires that where a proposed project would have significant environmental effects, the project cannot be approved unless "[c]hanges or alterations have been required in, or incorporated into, [the] project which mitigate or avoid the significant environmental effects thereof" or the agency determines that mitigation is unfeasible. CAL. PUB. RES. CODE § 21081. In general, the obligation to describe mitigation under CEQA parallels the obligation under NEPA, notwithstanding CEQA's substantive requirement. The court addresses CEQA separately solely to discuss TRPA's invocation of *Sacramento Old City Ass'n v. City Council,* 229 Cal.App.3d 1011, 1029, 280 Cal.Rptr. 478 (1991) ("*SOCA* "). TRPA argues that *SOCA* established that

23. Moreover, the court is skeptical, at least, as to whether the Amendments and EIS demonstrate that no harm will occur prior to implementation of the Blue Boating Program. Although "new" buoys (those in excess of 4,454) will not be authorized until the Blue Boating Program is implemented and only five piers applications may be submitted annually, authorization of replacement buoys and construction of ramps and boat slips is unthrottled. Although the adaptive management program is immediately effective, it is also reactive, imposing measures once the previous year's mitigation efforts have been shown to be inadequate.

TRPA argues that although the adaptive management program is backward looking, the annual evaluations will allow reaction before impacts become significant because the each year boating emissions will increase by

at most by one percent. TRPA's Reply, 9 (citing AR 2:774). On the factual question, the EIS states that the increase will be one percent per year on average, but acknowledges that the rate of increase will fluctuate. The EIS does not address whether initial construction of ramps and slips will front-load the increase. On the legal question, it appears that even a one percent increase may be significant in light of non-attainment of Compact thresholds and TRPA's acknowledgment of the limited number of tools available to secure attainment. Admittedly, where an agency determines in an EIS that an impact is insignificant, the agency's interpretation of significance receives some deference. Here, however, TRPA cites to no discussion in the EIS of whether a one percent increase is significant.

[an] agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated.

TRPA's brief at 15. TRPA mischaracterizes *SOCA*, which does not permit the delayed implementation of mitigation measures TRPA proposes here.

TRPA's error stems from omission of the preface to the above passage from *SOCA*. The first sentence is preceded by the limitation "for kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process (*e.g.*, at the general plan amendment or rezone stage) ..." *SOCA*, 229 Cal.App.3d at 1029, 280 Cal.Rptr. 478.[24] The importance of these qualifiers is illustrated by *SOCA* itself. *SOCA* concerned a CEQA challenge to the City of Sacramento's expansion of the Sacramento Convention Center. This expansion would require, at most, 2,621 additional parking spaces, and the EIR stated that "overall level of parking utilization in the study area should not exceed 90 percent." *Id.* at 1020, 1022, 280 Cal.Rptr. 478. These were "specific performance criteria" that the City committed to meeting, but the court did not rest on these facts. Instead, the court extensively discussed the EIR's evaluation of seven potential measures to mitigate this impact, including possible methods of implementation and results achievable by at least some of the measures. *Id.* at 1020, 280 Cal.Rptr. 478, *see also id.* at 1030, 280 Cal.Rptr. 478 (de-

scribing the EIR's discussion of these alternatives as "extensive"). In light of this discussion, the court rejected plaintiffs' argument that the EIR was required to provide specific mitigation measures. *Id.* at 1026, 1030, 280 Cal.Rptr. 478. Because the City had shown that impacts could and would be mitigated, CEQA was satisfied.

Subsequent cases have confirmed this reading of *SOCA*. "*SOCA* stands for the proposition that when a public agency has evaluated the potentially significant impacts of a project *and has identified measures that will mitigate those impacts,* the agency does not have to commit to any particular mitigation measure in the EIR, as long as it commits to mitigating the significant impacts of the project." *Cal. Native Plant Soc'y v. City of Rancho Cordova*, 172 Cal.App.4th 603, 621, 91 Cal. Rptr.3d 571 (2009) (emphasis added). "[T]he sufficiency of the information contained in an EIR is reviewed in light of what is reasonably feasible," and *SOCA* applies where "devising more specific mitigation measures impractical." *Rio Vista Farm Bureau Ctr. v. County of Solano*, 5 Cal.App.4th 351, 375, 377, 7 Cal.Rptr.2d 307 (1992). Both *Cal. Native Plant Soc'y* and *Rio Vista* upheld EIRs under *SOCA* where the EIR offered a mitigation plan that merely lacked site-specific details. *Cal. Native Plant Soc'y,* 172 Cal.App.4th at 610, 623, 91 Cal.Rptr.3d 571 (EIR did not specify where off-site habitat mitigation would occur), *Rio Vista,* 5 Cal.App.4th at 366–67, 7 Cal.Rptr.2d 307 (EIR did not specify site for future waste management facility).

For the reasons stated in the prior section, the EIS does not demonstrate that mitigation is feasible. *SOCA* allows an agency to defer selection of a particular mitigation plan only when there is reason to believe that at least some available plan

---

**24.** TRPA also omits the fact that the entire passage is taken from *SOCA*'s quotation of a treatise, Remy et al., *Guide to the Cal. Environmental Quality Act* 200–201 (1991 ed.).

will work. TRPA also has provided no explanation as to why it would have been impractical to provide the missing detail in the EIS.[25] Accordingly, assuming that *SOCA* and its progeny apply to EISs prepared under the Compact, these cases do not alter the court's conclusion that the EIS here is inadequate.

### 3. Mitigation of Recreational Impacts

 Plaintiffs separately challenge the EIS's finding that the Amendments would not have significant adverse impacts on recreational uses in the lake, including attainment of the recreational thresholds. The EIS acknowledged that piers can interfere with recreational uses, including use by pedestrians on the shore, AR 2:783, and use by boaters traveling near the shore, AR 2:785. The EIS concluded new piers authorized by the Amendments would not significantly adversely affect these recreational uses because (a) measures would minimize the impacts of new piers and (b) remaining impacts of new piers would be mitigated through removal of existing barriers to access.[26] The court concludes that TRPA failed to support this finding. The court separately concludes that TRPA was required to at least discuss the potential recreational impacts of additional buoys.

### a. Measures to Limit The Impacts of Individual Piers

The EIS recognizes that factors such as the design and location of a pier influence the degree to which the pier impedes recreational access. The Amendments imposes several design and siting criteria. The Amendments generally prohibit construction of piers in the forty percent of the lakeshore designated as Shorezone Preservation Areas, areas in which pier construction would have particularly significant recreational impacts. AR 2:754. TRPA notes that a new pier cannot be constructed within fifty feet of an existing pier. AR 2:739. The Amendments prohibit storage under or alongside piers, facilitating public passage under the piers. Code § 51.2.G.

In addition to these substantive requirements, TRPA argues that it may rely on the California State Lands Commission ("CSLC") to ensure that new piers will not violate rights of public access protected by California's public trust doctrine. CSLC is charged with interpreting and enforcing the California public trust. *Nat'l Audubon Soc'y v. Superior Ct.*, 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709 (1983). TRPA contends that no new pier can be permitted in California absent CSLC's separate approval, and neither plaintiffs nor CSLC have disputed this contention. *See* Code § 54.5.A(1)(d) (no new pier will be permitted unless it reaches a bottom elevation of 6219 feet), CAL. PUB. RES. CODE § 6301 (stating that CSLC has exclusive jurisdiction over submerged lands), § 6321 (CSLC may authorize construction over submerged lands). It follows, TRPA argues, that no pier will be constructed in violation of the California public trust.

---

**25.** Finally, the project is not fully contingent on achieving goals, as stated in footnote 24. *Fed'n of Hillside & Canyon Ass'ns v. City of Los Angeles*, 83 Cal.App.4th 1252, 1262, 100 Cal.Rptr.2d 301 (2000) (*SOCA* inapplicable absent "a binding commitment to implement the mitigation measures.").

**26.** The EIS also found that the Amendments would further other types of recreational uses,

such as motorized boating itself. TRPA has not argued, however, that the finding of no adverse impact rested on the conclusion that the benefits of improvements to that type of access outweigh any harm to non-motorized recreational uses. The court therefore does not address whether such a conclusion would have been permissible. The court's review is limited to TRPA's conclusion that non-motorized recreation would be unimpaired.

TRPA must avoid impacting recreational access, including impacts to rights granted by the California public trust. It appears that one method by which TRPA could have fulfilled this duty would have been to sign a *memorandum of understanding* delegating authority to CSLC or otherwise formalizing a relationship between the two. In such a memorandum, TRPA could inform CSLC of TRPA's reliance, confirm that CSLC could meet TRPA's needs, and make TRPA's approval of piers contingent on CSLC approval. TRPA did not do this. The Amendments instead mandate nonbinding consultation with CSLC:

> Prior to the approval of any project in shorezone of the State of California that may adversely affect legal public access, TRPA shall consult with California State Lands Commission to obtain the Commission's determination whether legal public access exists under California law. If TRPA does not receive timely written comment from the Commission after providing notice of the proposed project, TRPA may approve the project without comment from State Lands[.]

Code § 54.4.B(1). Nothing compels TRPA to act in accordance with CSLC's determination, and TRPA does not represent that it will always do so.[27] *See* TRPA's brief at 26 ("TRPA *may* then incorporate solutions to public access issues proposed by CSLC") (emphasis added). It may be that, in practice, CSLC's own acts in granting or withholding leases will be such that all piers comply with California's public trust. TRPA may not shirk its own duty, however, on the unexamined assumption that CSLC will not do the same, instead picking up TRPA's slack.

Furthermore, even piers that *do not* violate public trust rights may "adversely af-

fect the desire of pedestrians to move laterally along the beach or affect waterside nearshore lateral recreation (*e.g.*, kayaking, swimming, top-line fishing)." TRPA's brief at 27 (citing AR 2:743). Thus, while compliance with the above standards lessens a pier's impact on recreational access, the EIS and Amendments acknowledge that the above measures, standing alone, are insufficient to ensure that the Amendments do not interfere with recreational access. EIS 2:743, 783 ("The basis for mitigation is that pier construction impairs public recreational access along the lake."). Such additional mitigation is required regardless of whether CSLC will ensure that new piers do not offend California's public trust.

### b. Measures to Mitigate Remaining Recreational Impacts

The Amendments propose to mitigate the unavoidable impacts of new piers by using fees levied on new piers to remove existing barriers to recreational access. Construction of a new private pier will carry a fee of $100,000, and expansion of a private pier will incur a fee of $20 per square foot of additional area. Code § 54.13.A. The EIS contains conflicting explanations as to the derivation of this fee. The final EIS first explains that:

> The amount of the fee is based on estimation of the costs of providing equivalent replacement value for recreation and public access *by* removing a pier from a developed parcel and restricting development on the parcel with an easement.

AR 2:744 (emphasis added). The document later states that:

> The amount of the LTPAF fee is based on a real-world estimation of the costs of

---

**27.** The narrow exception is that when TRPA approves a pier (with or without CSLC approval), the pier must "be located on the parcel to minimize impacts to the environ-

ment and legal public access as determined pursuant to Subsection 54.4.B." Code § 54.5.A(1)(c).

providing equivalent replacement value for recreation and public access *that would result from* removing a pier from a developed parcel and restricting development on the parcel with an easement. AR 2:784 (emphasis added). Both explanations cite AR 6:3645, which explains that this fee represents the physical cost of removing a pier (*e.g.,* labor, machinery and disposal) plus the cost of purchasing a 10 linear foot easement on the subject land.

▮▮▮ The parties sharply disagree as to how this money will be spent, and thus whether the fee is adequate. Under either party's interpretation of the program, the TRPA's finding was arbitrary and capricious.

If the LTPAF is intended to pay for the removal of existing piers, as plaintiffs argue, then the EIS fails to include a reasonable examination into whether the fee is adequate. Plaintiffs argue that there is no indication that lakefront property owners would be willing to part with a pier for the $80,000 at which TRPA values an easement. If the LTPAF is intended to actually fund removal of piers, pier owners' willingness to sell piers for this price is "an important aspect of the problem" that TRPA was required to consider. *McNair,* 537 F.3d at 987. TRPA has not identified any such consideration in the EIS.

TRPA argues that although the LTPAF fee is calculated based on the price of removal, the fee is intended to be used to fund other activities. The EIS, in describing the uses to which the LTPAF fees will be put, states that the fund will go to "projects" with priorities for acquisition of

public access, construction or modification of public access facilities, and "other projects that demonstrably improve public recreational access." AR 2:744. Thus, TRPA explains, the LTPAF will fund improvements to access that provide a benefit equivalent to that of pier removal rather than funding actual pier removal. While this may be a viable approach in principle, it suffers from the same deficiencies identified with regard to the Blue Boating Program and buoy mitigation fees. TRPA has not included a "reasonably complete" discussion of what these projects might be, their efficacy, or whether the LTPAF will be able to afford them.

Lastly, for the reasons stated in part III(B)(2)(c)(i) above, inclusion of the Adaptive Management Program in the package of measures that will be used to mitigate impacts on recreation does not render the discussion of mitigation "reasonably complete."

For these reasons, TRPA's conclusion that construction of new piers authorized by the Amendments would not significantly adversely affect recreation was arbitrary and capricious.[28]

### c. Recreational Impacts of Buoys

Plaintiffs separately argue that "the EIS failed to study the recreational access impacts of more buoys." The EIS recognizes that "shorezone structures" can negatively impact users of "small non-motorized watercraft," and that "buoys placed close together, particularly if located in large buoy fields that extend far into the Lake" may impair recreational fishing. AR 7:4184–85.[29] Contrary to plaintiffs' characterization of the record, however, the EIS does

---

28. Because the court resolves the recreational impacts issue on these grounds, the court does not address CLSC's argument that TRPA's decision to adopt the Amendments was invalidated by TRPA's eleventh-hour omission of other proposed restrictions on pier construction.

29. The court acknowledges some ambiguity as to whether the above statement regarding "shorezone structures" implicates buoys. TRPA has represented that this section of the EIS "analyzed the impacts of buoys on recreation, including swimming and kayakers." TRPA's Reply at 14 n. 20. No other language in this section implicates both buoys and kayaking. The court therefore understands

not conclude that the recreational impacts of shorezone structures generally, or buoys specifically, is significant.

In arguing that a study of these effects was required, plaintiffs cite several comments submitted during the EIS process complaining about the impacts of buoy fields on kayaking. AR 4:2562, 25:16517, 26:16681–82. Plaintiffs argue that the "substantial controversy" regarding buoys compelled such a study, citing *Babbitt*, 241 F.3d at 731. The cited portion of *Babbitt* concerned application of 40 C.F.R. § 1508.27, which provides that controversy regarding the magnitude of effects is an indication that those effects are significant for purposes of NEPA. 40 C.F.R. § 1508.27(b)(4). In *Glenbrook Homeowners Ass'n*, 425 F.3d at 615–16, the Ninth Circuit rejected a claim that controversy over a project compelled TRPA to complete an EIS, explaining that such a claim rests on NEPA regulations inapplicable to the Compact.

■■■ The inapplicability of 40 C.F.R. § 1508.27, however, does not mean that TRPA's omission of further discussion is unreviewable. The court must ask whether the EIS took a "hard look" at the potential impacts. *Methow Valley*, 490 U.S. at 352, 109 S.Ct. 1835. Agency action is arbitrary and capricious where the agency has "entirely failed to consider an important aspect of the problem." *McNair*, 537 F.3d at 987. As the undersigned recently explained, an aspect of the problem may be "important" for purposes of this rule even where it is not "significant." *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F.Supp.2d 1247, 1269 (E.D.Cal. 2010) (reviewing the NMFS's silence as to certain factors in discussing whether agency action would jeopardize protected species in violation of

the Endangered Species Act). Some issues are important enough to demand a statement from the agency as to whether or not they are significant. *Id.* Although no easy rule separates the important from the unimportant, where TRPA itself has stated that buoys impact recreation, the court is satisfied that the problem is important.

■■■ The fact that TRPA has commented on the issue then raises the question of whether the agency has taken the requisite "hard look." The EIS recognized the potential problem but included no discussion of its magnitude. This was not sufficient. The court does not hold, on the present record, that TRPA was required to engage in a full-blown EIS analysis of the impacts additional buoys would have on non-motorized vehicle access, replete with additional studies. Because these impacts were an important aspect of the problem, however, TRPA was required to at least state a decision as to whether or not these impacts were significant. This would have enabled plaintiffs to challenge that decision and presented the court with a record in which judicial review was possible. *S. Yuba*, 723 F.Supp.2d at 1269.

### 4. Mitigation of Scenic Impacts
■■■ Plaintiffs challenge TRPA's finding that construction of new piers would not have significant adverse impacts on scenery. The EIS took the requisite hard look at these impacts and included a reasonably complete discussion of mitigation measures. TRPA's conclusion that piers would not adversely impact scenic values was neither arbitrary nor capricious.

#### a. Standards for Scenery
Scenery, unlike air and water quality or even recreational access, is difficult to

TRPA's statement to mean that shorezone structures, for purposes of this issue, include buoys.

quantify. TRPA has adopted four scenic thresholds, each of which addresses different elements of scenic quality in the basin. These thresholds may be summarized as encompassing:

(SR–1) the quality of scenic resources from viewpoints along major roadways in the Basin and from the Lake towards shore;

(SR–2) the quality of specific views of scenic features of the Basin's natural landscape that can be seen from major roadways and the Lake;

(SR–3) the "viewshed" from public recreation areas and certain bicycle trails; and

(SR–4) the design standards and guidelines for the built environment to produce built environments compatible with the natural, scenic, and recreational values of the region.

*Comm. for Reasonable Regulation of Lake Tahoe,* 311 F.Supp.2d at 979 (citing, *inter alia,* Resolution 82–11, Ordinance 93–14).

TRPA uses at least two quantitative tools in assessing scenic value. One is a "contrast rating" that derives a numeric score based on the size of a building's facade, the coloration, the amount of glass, the building structure, the material texture, and the obstruction of the facade's perimeter. *See* Shorezone Property Owners' Request for Judicial Notice Ex. 2, at 144–50 (TRPA Design Review Guidelines, App. H, Visual Assessment Tool for the Review of Projects Located Within the Shoreland). Under this rating, higher scores present better scenic values. Second, and more simply, TRPA measures the amount of "visible mass."

TRPA also exercises informed judgment. For example, TRPA has determined that visibility of man-made objects is not a *per se* detriment to scenic quality. In discussing the scenic impacts of additional buoys, TRPA concluded that the scenic impact of a boat moored to a buoy "is not typically adverse because the presence of watercraft is an expected component of lake views and contributes to the scenic values of the lake." AR 2:782. TRPA concluded that the sight of too many boats clustered together, however, did degrade scenic quality. *Id.*[30]

### b. Avoidance and Mitigation of Piers' Scenic Impacts

The EIS found that the addition of piers to the lake increases visible mass in the shorezone and thereby impacts scenic quality. AR 2:780. As with recreation, the Amendments address impacts on scenery through a combination of measures designed to minimize the impacts of new piers and measures designed to mitigate those impacts that cannot be avoided. The former measures are largely the same as those for recreation. Siting criteria restrict construction of new piers in areas where they would have a particularly dramatic impact on scenery, such as Shorezone Protective Areas and "naturally dominated shoreline." AR 2:780. Siting criteria also restrict pier density. Design criteria limit pier size, construction, and coloration. AR 2:740.

Despite these restrictions, new piers will still have a visual impact. The Amendments propose to mitigate these impacts by requiring owners of new piers to remove visible mass and to achieve certain contrast ratios. As to visible mass, in areas in attainment of the scenic thresholds, the owner must mitigate the pier's visible mass at a 1:1 ratio.[31] Code

---

**30.** Plaintiffs here do not challenge TRPA's finding that the buoys authorized by the Amendments would not have adverse impacts on scenery.

**31.** The amended Ordinances impose slightly different, but more rigorous, standards for mitigation of visible mass of boat lifts.

§ 54.6.D(1). In areas not in scenic attainment, all visible mass must be mitigated at a 1:1.5 ratio. *Id.* This mitigation "must occur first in the shorezone of the project; once shorezone possibilities are exhausted, mitigation may occur in the project area shoreland." AR 2:740, Code § 54.6.D(2)(a). "Mitigation may either be removal or screening of visible structure." Code § 54.6.D(2)(d). As to contrast, whenever a landowner constructs a pier or otherwise undertakes a "project" in the shorezone, the landowner must bring the onshore project area up to a contrast rating of 25. Code § 54.6.C(1). Because the landowners were previously only required to reach a contrast rating of 21, this will likely lead to improvements over existing conditions with regard to contrast. AR 2:781.[32]

In contrast with the EIS's discussion of mitigation of air, water, and recreational impacts, the above discussion is reasonably complete. Plaintiffs substantively disagree with TRPA's conclusion that the addition of visible mass on the lake can be mitigated by removal of visible mass on the shore. As noted, a new pier must be accompanied by an offset of visible mass and attainment of contrast rating that TRPA found would be an improvement for most parcels. Visible mass will also often be mitigated at a greater than 1:1 ratio. Although the scenic character of a parcel without a pier is undoubtedly *different* than that of a parcel with a pier, equivalently reduced onshore visible mass, and an improved contrast rating, TRPA concluded that the former was not *better.* This conclusion was based on an analysis of simulations of what these changes would look like in a variety of parcels and the

agency's considered opinion. AR 2:779–82, 6:3744–56. TRPA's finding that the Amendments would not significantly adversely affect scenic values was neither arbitrary nor capricious.

### 5. Mitigation of Noise Impacts

Plaintiffs' argument regarding impacts on noise follows a familiar pattern. Plaintiffs argue that new boating facilities will induce additional boating, that more boats will mean more noise, and that the Amendments' proposals for mitigation of this impact are impermissibly vague. The EIS acknowledges that the Amendments will "increase noise levels throughout the area" by inducing "increases in boating activity." AR 2:791. This impact is purportedly mitigated by "[t]he Blue Boating Program, monitoring and enforcement programs funded by annual buoy fees, and the LTPAF." *Id.*

With respect to noise, the Blue Boating Program and LTPAF suffer the same problems discussed above. In addition to the Blue Boating Program elements pertaining to air and water quality, the Blue Boating Program will include "[a] noise reduction program to implement noise guidelines for the protection of wildlife and community well-being." Code § 54.15.A(2). The EIS's discussion of noise states that the Blue Boating Program will include "standards regarding appropriate engine types, engine emissions, and other boating features[ ] and use of appropriate engine equipment with regard to noise standards." AR 2:791. These features, equipment types, *etc.*, are unspecified and their benefits unexplained. As to the LTPAF, the EIS asserts that this

---

**32.** The EIS also states, in passing, that the LTPAF fees and buoy fees will mitigate scenic impacts. AR 2:780, 782. The description of the LTPAF program does not appear to refer to scenic projects, and the court has previously explained these programs' indefiniteness. Nonetheless, mere inclusion of these measures in the discussion of mitigation of scenic impacts, without clear reliance thereon, does not doom the EIS's analysis.

program will reduce noise by funding programs which encourage non-motorized boating, such as by improving recreational access. AR 2:792. The nature of these programs is not specified, nor is there any discussion of the extent to which such programs might induce would-be motorized boaters to use non-motorized boats instead.

The discussion of increased enforcement is more definite but nonetheless insufficient. Existing rules prohibit aftermarket boating devices that cause high "single event noise" and require low speeds in no-wake zones and Emerald Bay, which reduces engine noise. Code § 81.2.E(2)(b)(2), AR 11:7634. Present non-attainment of the noise thresholds results, in part, from inadequate enforcement of these limits. AR 11:7631. The Amendments will provide additional funding for enforcement, derived from buoy fees and possibly the Blue Boating Program.[33] Thus, the EIS describes a reasonably specific method for reducing the impacts of noise. The EIS provides only a bare assertion, however, that the additional enforcement reduces impacts *enough* to render them insignificant. *See also* part III(B)(2)(c)(i) above.

Accordingly, the TRPA's conclusion that the Amendments would not impose significant adverse effects on noise was arbitrary and capricious.

## C. The Outstanding National Resource Water Standard

The Clean Water Act creates a scheme of cooperative federalism under which, *inter alia*, States are directed "to institute comprehensive water quality standards establishing water quality goals for all intrastate waters." *PUD No. 1 v. Wash. Dep't of Ecology,* 511 U.S. 700, 704, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994) (citing 33 U.S.C. §§ 1311(b)(1)(C), 1313). These standards must incorporate an " 'antidegradation policy.' " *Id.* at 718, 114 S.Ct. 1900 (quoting 33 U.S.C. § 1313(d)(4)(B)). "The antidegradation policy and implementation methods shall, at a minimum," maintain three tiers of water quality. 40 C.F.R. § 131.12(a). California has adopted an antidegradation policy that is more nuanced than the minimum provided by 40 C.F.R. § 131.12(a), but which also incorporates the three federal tiers. Cal. State Water Resources Control Board, Memorandum: Federal Antidegradation Policy, Oct. 7, 1987, at 2 (citing Cal. SWRCB Resolution No. 68–16, "Statement of Policy with Respect to Maintaining High Quality Waters in California," and Cal. SWRCB Order No. WQ 86–17).

California protects Lake Tahoe under the most stringent of the three tiers, as an "Outstanding National Resource Water" ("ONRW").[34] This designation "prohibits any degradation of existing water quality standards with a limited exception for short-term or temporary changes in quality." *Nat'l Wildlife Fed'n v. Browner,* 127 F.3d 1126, 1127 (D.C.Cir.1997) (citing Water Quality Standards Regulation, 48 Fed. Reg. 51,400, 51,403 (1983)). Article V(d) of the Compact provides that "[t]he regional plan shall provide for attaining and maintaining Federal State, or local air and water quality standards, whichever are strictest, in the respective portions of the region for which the standards are applicable." Plaintiffs argue that TRPA must therefore

---

**33.** *Compare* AR 2:791 (The Blue Boating Program and programs funded by the annual buoy fee would include monitoring and enforcement" of speed restrictions) *with* AR 2:830–31 (providing no reference to speed limits in describing the enforcement or mitigation fee aspects of the Blue Boating Program).

**34.** The parties agree that the California SWRCB designated Lake Tahoe as an ONRW in 1980.

comply with the ONRW standard, but that the Amendments will cause decreases in water quality. TRPA opposes this claim solely by arguing that the Amendments will not result in degradation of water quality.

This claim imperfectly parallels plaintiffs' EIS claim. For example, while the Compact's EIS provision obliges TRPA provide information sufficient to enable meaningful public participation, the ONRW claim appears to merely challenge TRPA's conclusion that the Amendments would achieve the requisite substantive result. Nonetheless, the deficiencies in the record identified in part III(B)(2), above, demonstrate that TRPA acted arbitrarily and capriciously in adopting the Amendments in the face of the ONRW designation.

## IV. Conclusion

For the reasons stated above, plaintiffs' motion for summary judgment (Dkt. No. 87) is GRANTED and defendants' cross motion for summary judgment (Dkt. No. 98) is DENIED. Tahoe Regional Planning Agency Ordinance number 2008–10, adopted October 22, 2008, the Shorezone Amendments adopted at that time, the certification of the Environmental Impact Statement, and all findings based thereon are VACATED. The matter is REMANDED to defendant Tahoe Regional Planning Agency for further proceedings consistent with this order. The clerk shall enter judgment and close the file.

IT IS SO ORDERED.

### ORDER

Defendant has filed a Rule 59(e) motion to alter or amend the judgment of this court issued on September 16, 2010 (ECF No. 118). In that judgment, the court vacated Tahoe Regional Planning Agency Ordinance number 2008–10, adopted October 22, 2008, the Shorezone Amendments adopted at that time, the certification of the Environmental Impact Statement, and all findings based thereon. The court remanded the matter to defendant Tahoe Regional Planning Agency for further proceedings consistent with the order. The defendant timely filed a Rule 59(e) motion. For the reasons stated herein, the defendant's motion is DENIED.

## I. Background

In 1968, California and Nevada entered into the Tahoe Regional Planning Compact, approved by Congress the following year. The Compact was amended in 1980 "to increase the level of environmental protection for the [Lake Tahoe] Basin as a whole." *Tahoe–Sierra Pre. Council, Inc. v. TRPA*, 322 F.3d 1064, 1071 (9th Cir. 2003). The Compact, as amended, directed the Tahoe Regional Planning Agency ("TRPA") to develop "thresholds," or environmental standards "necessary to maintain a significant scenic, recreational, educational, scientific or natural value of the region or to maintain public health and safety within the region." Compact art. II(I). The TRPA regulates the region by promulgating rules and plans, including a Regional Plan adopted in 1987 and implemented by the TRPA's Code of Ordinances and Rules of Procedure. The TRPA also regulates on a project-specific basis. Before approving specific projects, the TRPA must prepare an environmental impact statement ("EIS"). Compact art. VII(a)(2). A project cannot be approved unless either "changes or alterations" have reduced the "significant adverse environmental effects to a less than significant level" or the agency determines that mitigation is "infeasible." Compact art. VII(d)(1) and (2).

In 2008, the TRPA adopted the Shorezone Amendments, which included provisions regarding piers, buoys, and other boating facilities. Before adopting the amendments, the TRPA prepared an EIS,

which concluded that the amendments included mitigation measures that would mitigate negative environmental impacts to a "less than significant" level. Relying on the EIS, the TRPA concluded that the Amendments satisfied the obligation to maintain and achieve thresholds. Plaintiffs in this case challenged the Amendments, arguing that TRPA's conclusions were arbitrary and capricious, and relatedly, that the TRPA's actions violated the Clean Water Act.

This court agreed that TRPA's conclusions that the Amendments satisfied TRPA's obligation to maintain and achieve thresholds, and that the Amendments' adverse impacts were mitigated to a "less than significant" level were arbitrary and capricious. The court also agreed that TRPA's conclusion that the Amendments comport with the Clean Water Act was arbitrary and capricious. Order at 10, ECF No. 118. In so doing, the court held that the EIS had improperly included existing unpermitted buoys as part of the 'baseline' environmental conditions to which the environmental impact of the Amendments were compared. The court vacated TRPA Ordinance number 2008–10, adopted October 22, 1008, the Shorezone Amendments adopted at that time, the certification of the EIS, and all findings based thereon.

Defendants now move to alter or amend the judgment, and plaintiffs oppose.

## II. Standard

A district court has wide discretion when considering a Rule 59(e) motion to amend a judgment. *Turner v. Burlington Northern Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir.2003). Reconsideration under Rule 59(e) is appropriate if "the district court (1) is presented with newly considered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist.*

*No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

## III. Analysis

Defendant requests alteration of the judgment on two bases. First, defendant objects to the court's conclusion that it was improper to include existing but unpermitted buoys as part of the baseline environmental conditions in the EIS. Second, defendant argues that the court should not have vacated the Amendments in their entirety. Defendants have not presented any new evidence, and do not argue that there is any intervening change in controlling law. The court assumes, therefore, that defendants are arguing that alteration or amendment is warranted because the court committed clear error, or that judgment was manifestly unjust.

### A. The court's conclusion regarding the baseline was not clearly erroneous nor manifestly unjust.

The court acknowledges that whether or not to include existing but unpermitted buoys in the baseline for the EIS is a difficult question. However, the court's September 16, 2010 order thoroughly analyzed the issue, and defendants have not presented any new arguments against the court's conclusion in that order. The cases cited by the defendant on this point were discussed in the order, and were distinguished. Defendants argue that *Communities for a Better Environment v. South Coast Air Quality Management District*, 48 Cal.4th 310, 106 Cal.Rptr.3d 502, 226 P.3d 985 (2010) supports the proposition that the EIS for the Shorezone Amendments should use existing conditions, and not hypothetical ones as the baseline. As discussed in the prior order, *Communities for a Better Environment* was a state case decided under the California Environmental Quality Act

("CEQA"). That case involved an oil refinery that was permitted to operate all four of its boilers at maximum capacity, although no boiler actually operated at maximum capacity unless one of the other was shut down for maintenance. *Id.* at 322, 106 Cal.Rptr.3d 502, 226 P.3d 985. The Court overturned an EIS that used the authorized limit, rather than the actual practice as the environmental baseline, holding that the use of "hypothetical allowable conditions as a baseline results in illusory comparisons." *Id.* The case at bar is distinguished from *Communities for a Better Environment.* First, as noted, that case was decided under CEQA, while the instant case arises under the Compact. Second, the Compact's environmental protection goals go further than those of CEQA. As noted in the September 16, 2010 order, the Compact commands "TRPA to improve environmental quality, in some instances dramatically, by commanding setting and attaining environmental thresholds." Here, unlike in *Communities for a Better Environment,* use of the existing rather than the authorized, environmental conditions as a baseline would result in *less* environmental protection, not more. This case is the converse of *Communities for a Better Environment.* Given the Compact's remediational goals, the court continues to conclude that the EIS's use of existing unpermitted buoys in the baseline was improper, and that the conclusions based on that EIS were arbitrary and capricious.[1]

The defendant cites another state court CEQA case, *Fat v. County of Sacramento,* 97 Cal.App.4th 1270, 119 Cal.Rptr.2d 402 (2002), also thoroughly addressed in this court's September 6, 2010 order. The court continues to conclude that *Fat* does not carry weight here, and further that the *Fat* opinion did not contain any holding as to whether '*sub silento*' agency approval of existing unauthorized activity is in fact an agency action. Order at 27, ECF No. 118. Defendants have not raised any new arguments with respect to *Fat.*

## B. Vacation of the Amendments in their entirety was not clearly erroneous nor manifestly unjust.

Defendant argues in its motion for reconsideration that the court should not have vacated the Amendments in their entirety, and defendant requests that the court amend its order to vacate "only the portions of the Amendments that authorize the permitting of boating facilities and allow the other portions of the Amendments to remain in place." Def.'s. Mot. at 12, ECF No. 122. Defendant claims that plaintiffs only challenged the portions of the Amendments dealing with permitting of boating facilities and that the court's remedy should have severed those challenged Amendments. Plaintiffs in turn argue that the defendants never requested such severance prior to the instant motion, and further that vacation of the Amendments as a whole was proper, given that passage of the Amendments relied on the EIS that the court held to be invalid.

The court agrees with the plaintiffs. The court's order vacated certification of the EIS, leaving no valid EIS on which the Amendments could be approved. The proper remedy in this case, therefore, was to set aside all of TRPA's actions that were based on the EIS which the court has found to be inadequate.

1. The court notes that even if the court were to determine that it was proper to include the unpermitted buoys in the baseline, the adopted Amendments, which allow for one-to-one replacement of the unpermitted buoys, would not meet TRPA's obligation to achieve and maintain the thresholds.

## IV. Conclusion

For the foregoing reasons, defendants Rule 59(e) motion, ECF No. 121 is DENIED.

IT IS SO ORDERED.