**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SIERRA CLUB; FRIENDS OF
THE WEST SHORE,
        *Plaintiffs-Appellants*,

v.

TAHOE REGIONAL
PLANNING AGENCY,
        *Defendant-Appellee.*

Nos.  14-15998
        14-16513

D.C. No.
2:13-cv-00267-JAM-EFB

OPINION

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted April 12, 2016
San Francisco, California

Filed November 2, 2016

Before: J. Clifford Wallace, Mary M. Schroeder,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Schroeder

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's summary judgment and award of costs in favor of Tahoe Regional Planning Agency, a bi-state land use and environmental resource planning agency for the Lake Tahoe Region, on environmental organizations' claims that the environmental impact statement for TRPA's Regional Plan Update did not comply with the requirements of the Regional Planning Compact between California and Nevada.

The panel held that plaintiffs had standing and their claims were ripe. Applying a standard similar to the standard for evaluating an environmental impact statement under the National Environmental Policy Act, the panel held that TRPA's environmental impact statement and Regional Plan Update adequately addressed the localized effects of the runoff created by the amount of development permitted under the Update. TRPA's analysis of the effects of concentrating development in "community centers" was not arbitrary or capricious and did not violate Compact article VII(a)(2)(A) by failing to address significant environmental impacts of the Regional Plan Update. The panel also held that TRPA's assumptions regarding best management practices and whether they would reduce water quality impacts of concentrated development under the Regional Plan Update were not arbitrary or capricious and were supported by

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

substantial evidence. The panel affirmed the district court's award of costs.

## COUNSEL

Trent W. Orr (argued) and Wendy S. Park, Earthjustice, San Francisco, California, for Plaintiffs-Appellants.

Whitman F. Manley (argued) and Howard F. Wilkins III, Remy Moose Manley LLP, Sacramento, California; John L. Marshall, Tahoe Regional Planning Agency, Stateline, Nevada; for Defendant-Appellee.

Kamala D. Harris, Attorney General; Daniel L. Siegel, Supervising Deputy Attorney General; Nicole U. Rinke, Deputy Attorney General; Sacramento, California; for Amicus Curiae California Resources Agency.

Cassandra P. Joseph, Senior Deputy Attorney General; Office of the Attorney General, Carson City, Nevada; for Amicus Curiae Nevada Department of Conservation and Natural Resources.

Thomas Watson, City Attorney; Nira Doherty, Assistant City Attorney; City of South Lake Tahoe, South Lake Tahoe, Nevada; for Amici Curiae City of South Lake Tahoe, California; El Dorado County, California; Placer County, California; Douglas County; Nevada; Carson City and County, Nevada; and Washoe County, Nevada.

Lewis S. Feldman and Kara L. Thiel, Feldman McLaughlin Thiel LLP, Zephyr Cove, Nevada, for Amici Curiae Lake Tahoe Community College, South Shore Chamber of

Commerce, North Lake Tahoe Chamber of Commerce, Sierra Nevada Association of Realtors, Incline Village Board of Realtors, Lake Tahoe Visitors Authority, Tahoe Douglas Visitors Authority, South Tahoe Alliance of Resorts, and Barton Health.

**OPINION**

SCHROEDER, Circuit Judge:

**INTRODUCTION**

The Lake Tahoe Region is an area of unmatched beauty surrounding the largest alpine lake in North America. It first caught the world's attention with the 1960 Winter Olympics at Squaw Valley, when the area became a recreation destination and home to a rapidly expanding population. It has since become the focus not only of admiration for the lake's beauty and clarity, but of litigation over the efforts to preserve them. *See, e.g.*, *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725 (1997); *People v. Tahoe Reg'l Planning Agency*, 766 F.2d 1308, 1310 (9th Cir. 1985); *Sierra Club v. Tahoe Reg'l Planning Agency*, 916 F. Supp. 2d 1098, 1105 (E.D. Cal. 2013).

This case concerns the Regional Plan Update ("RPU") that the Tahoe Regional Planning Agency ("TRPA") adopted in 2012 after more than ten years of work. Plaintiffs, The Sierra Club and Friends of the West Shore, are environmentalist organizations that challenged the environmental impact statement ("EIS") for the RPU. They now appeal the district court's summary judgment in favor of TRPA.

The RPU generally restricts future development to areas that are already developed, and sets forth the amount of further development that will be permitted in those areas in the future. The precise nature of that development is to be determined in Area Plans to be adopted later.

Plaintiffs' principal contentions in this appeal are that the RPU fails adequately to address the localized effects of the runoff created by the amount of development permitted, and that the RPU improperly assumes that best management practices ("BMP"s) can be utilized to achieve the planning goals, in light of TRPA's poor record of enforcing BMPs in the past.

We also must consider TRPA's challenge to standing and ripeness. While there will doubtless be more litigation concerning subsequent Area Plans, Plaintiffs' interests in the lake are affected by the RPU, and they will have no future opportunity to challenge the policies the RPU adopts. We therefore hold that Plaintiffs have standing to assert claims that are ripe.

On the merits, however, we conclude that the district court properly entered summary judgment in favor of TRPA. The draft EIS drew criticisms that necessitated substantial revisions, but the final EIS for the RPU adequately addressed localized impacts on soil conservation and water quality. Notably, while California had strenuously objected to certain aspects of the draft EIS, particularly with respect to the localized impacts of runoff, both California and Nevada now urge approval of the plan, as evaluated in the final EIS. We also hold that TRPA reasonably concluded that, in light of anticipated improvements in BMP maintenance, the

development permitted in the RPU would have less than a significant effect on water quality.

Our analysis must take place against the background of past efforts to maintain the pristine quality of the lake, so we begin with an historical summary.

## HISTORICAL BACKGROUND OF TRPA'S 2012 REGIONAL PLAN UPDATE

Lake Tahoe is located in the northern Sierra Nevada Mountains, and covers 191 square miles. The Lake Tahoe Region comprises 501 square miles, including the lake. The Region encompasses the Lake Tahoe basin, a watershed situated between the main crest of the Sierra Nevada and the Carson mountain ranges. The lake's outlet is the Truckee River, running from the north end of Lake Tahoe to Pyramid Lake in Nevada. The basin was acquired by the United States in the mid-1800s, but later in the century, private owners acquired much of the land and converted it to agricultural use, as well as beginning the resort industry at the south end of the lake. *See* Richard J. Fink, *Public Land Acquisition for Environmental Protection: Structuring a Program for the Lake Tahoe Basin*, 18 Ecology L.Q. 485, 493, 498–99 (1991).

Two-thirds of the region is in California and one-third is in Nevada. In the late twentieth century, the population of the region expanded by more than 70%, with the most rapid expansion, as described in the draft EIS, occurring in the 1970s.

The attraction is the lake's size, depth, and distinctive blue color. The lake's clarity is the result of the lack of algae. *See League to Save Lake Tahoe v. Tahoe Reg'l Planning*

*Agency*, 739 F. Supp. 2d 1260, 1264 (E.D. Cal. 2010), *aff'd in part & vacated in part*, 469 F. App'x 621 (9th Cir. 2012). In the region's natural state, its poorly developed soils contribute relatively small amounts of sediment to the lake, and biological communities, known as stream environment zones ("SEZ"s), remove sediments and nutrients. *See* Fink, 18 Ecology L.Q. at 494.

Human activity in the late twentieth century, however, began increasing nutrients and sediments in the lake, bringing about a decline in clarity. Deposits tied to human activity were to blame. *See* Holly Doremus, *Reinvigorating the Union of Wonder and Power*, 24 Va. Envtl. L.J. 281, 285 (2005). According to scientists, the loss of clarity was tied to nitrogen and phosphorous related to soil erosion, sewage discharge, and runoff from impervious developments. *Id.* More recently, scientists added to the list of threats atmospheric deposits caused by rain washing nitrogen from automobile exhaust down into the lake. *Id*. at 285–86; *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1070 (9th Cir. 2003) (explaining the process of "eutrophication," by which nutrients encourage the growth of algae, which makes the water greener and less clear and depletes oxygen in the water, to the detriment of fish and other animals). As this court has explained, artificial disturbance of the land, especially in steeper areas and areas near streams and other wetlands, greatly increases soil erosion and the flow of nutrients into the lake. *Tahoe-Sierra*, 322 F.3d at 1070. There have been other problems as well. As one district court put it, "[t]he Lake Tahoe Basin has also suffered from degradation of other measures of water and air quality. Many of the aesthetic and recreational values of the region have been impaired, including scenery, noise, and the ability to use the lake for

recreational purposes." *League*, 739 F. Supp. 2d at 1265. These declines have been caused by onshore development, piers and other structures in the lake, and emissions from motorized watercraft. *Id*.

The visible decline in water clarity led to efforts to reduce discharges into the lake, beginning with prohibition of sewage into any waters of the Tahoe basin. *See* Fink, 18 Ecology L.Q. at 504. In 1968, California and Nevada entered into the first Regional Planning Compact, which Congress approved in 1969. *Suitum*, 520 U.S. at 729. The Compact created TRPA to serve as a bi-state land use and environmental resource planning agency for the Lake Tahoe Region. *See id*.; Compact art. I(b). TRPA's governing board includes a California delegation and a Nevada delegation, with delegation members appointed by various state, county, and city entities. Compact art. III(a)–(g). TRPA appoints an advisory planning commission and employs an executive officer and other staff and legal counsel. Compact arts. III(h), IV(a).

The original Compact also adopted a system, known as the "Bailey system," for classifying the environmental sensitivity of the lands, with limits for the amount of development on each type. *See Tahoe-Sierra*, 322 F.3d at 1070. That system remains as part of TRPA's regulatory scheme, but was not enforced with sufficient strictness to protect the lake and its environment. As this court explained, TRPA's regulatory scheme, incorporating the Bailey system, "was diluted in its implementation by numerous exceptions permitting development on sensitive lands." *Id*. at 1070–71. In other words, some people thought the 1969 Compact was not sufficiently anti-growth. *See People*, 766 F.2d at 1310.

In 1980, Congress therefore approved Compact amendments, requiring TRPA to adopt a Regional Plan, and barring any development exceeding environmental threshold carrying capacities. *Suitum*, 520 U.S. at 729. The Compact, as amended, requires that the Regional Plan include a land use transportation plan, a conservation plan, a recreation plan, and a public services and facilities plan. Compact art. V(c). Pursuant to the 1980 Compact, TRPA has adopted multiple threshold standards for, *inter alia*, water and air quality, fisheries, and vegetation.

TRPA adopted its first Regional Plan in 1984, but that was challenged in court by the State of California, leading to a reissuance of the Plan, adding a land classification system that rated individual land parcels on their suitability for development. The Individual Parcel Evaluation System, or "IPES," rated the land on a scale of 0 to 1150, and only those above an "IPES Pass-Fail Line" were eligible to apply for permission to develop parcels.

Between 1987 and 2010, the 1987 Regional Plan was both amended and litigated. *See Tahoe-Sierra*, 322 F.3d at 1073–74. In 1997, TRPA adopted the "Environmental Improvement Program" as part of the Regional Plan to improve water quality, yet, according to the 2012 RPU, the primary pollutants affecting water clarity and quality remained sediment, nitrogen, and phosphorous.

The draft EIS for the RPU now before us concluded that the 1987 Plan was largely successful in slowing growth and making new development more environmentally compatible by "tightly controlling" what could be built on vacant land. It concluded that "the Tahoe region is now virtually at full

build-out, with less than 10% of the region's development rights remaining."

Unfortunately, as the draft EIS explained, buildings and other uses put into place before the 1987 plan continue to cause environmental problems. Hence, the 2012 RPU was intended to address these issues. As described in the draft EIS, the 2012 RPU was intended to "repair damage of the past, while also promoting redevelopment of Tahoe's localized town centers to accelerate obtainment of threshold standards with more environmentally appropriate and attractive structures."

The RPU was developed by the Regional Plan Update Committee of the TRPA governing board over a period of nearly ten years. Indeed, the process took so long that Nevada passed a bill calling for the state's withdrawal from TRPA if the plan were not updated in a timely manner. Nev. Senate Bill 271 (2011).

The RPU, adopted by TRPA's board on December 12, 2012, and effective February 9, 2013, was meant to be a general governing document for development and environmental protection in the region, leaving more local governance to Area Plans. Such Area Plans must conform to the RPU.

The RPU provided for the concentration of new and existing development into "community centers." It encouraged concentrated development by allowing TRPA itself, or local governments, through the "Area Plans," to raise density, height, and coverage limits in community centers. "Coverage" refers to the coverage of land with impervious material such as asphalt and concrete. The RPU

emphasized the Total Maximum Daily Load ("TMDL") model, which aims to reduce the total flow of certain pollutants into the lake.

## REGULATORY HISTORY OF THE RPU AND ITS EIS

The events that occurred during the regulatory process following the release of the draft EIS and draft RPU, and leading to the issuance of the final EIS and final RPU, are critical to the proper understanding of the issues in this case.

The draft EIS and draft RPU were released in April 2012, with a public comment period open for 63 days, from April 25 to June 28, 2012. The draft RPU and the draft EIS were released for public comment on April 25, 2012, followed by a series of meetings conducted by both California and Nevada to make recommendations for amendments. TRPA's governing board voted to incorporate the revisions recommended by the RPU Committee in August 2012, and the final EIS was issued October 24, 2012.

The RPU was undertaken concurrently with two related planning efforts, a Regional Transportation Plan and a Sustainable Communities Strategy. A separate EIS was produced for these two projects. In addition, in 2011, California, Nevada, and the Environmental Protection Agency ("EPA") approved the TMDL model, a water quality restoration plan that aims to reduce the total flow of certain pollutants into the lake. None of these efforts are affected directly by this litigation, but they are central to TRPA's analysis in the RPU and EIS.

During the public comment period on the draft RPU and EIS, TRPA received comments that fill a large volume of the final EIS. The California Attorney General submitted extended comments. She expressed concerns about delegation of project approval via Area Plans, weakening of coverage requirements, and allowance of potentially significant amounts of new development. With regard to land coverage, the Attorney General criticized the draft EIS's assumption that coverage could be calculated on a Basin-wide basis without regard to location and concentration of coverage. California was worried about concentrated localized pollution in the lake. The Attorney General also questioned TRPA's allowance of coverage transfers and mitigation across the boundaries of hydrologically related areas, *i.e.*, across different watersheds. With respect to the effects of concentrated development, she stated that watershed-level or even parcel-level analysis, rather than region-wide analysis, was more consistent with the Bailey system and with available science. The Attorney General also questioned the draft EIS's reliance on BMPs. She stated that because the track record for maintaining BMPs at Lake Tahoe was poor, the EIS "should disclose the history of neglected BMP maintenance and disclose the impacts of its alternatives assuming that past patterns of neglect continue into the future."

Plaintiffs also submitted extensive comments addressing many of the same issues. They expressed concerns that the draft EIS, while analyzing impacts of coverage transfer on Lake Tahoe itself, did not consider "soils, vegetation, streams, fisheries and invertebrates within streams, and sensitive habitat." They pointed out that non-degraded soils perform many functions, including "infiltration, erosion prevention, vegetation growth, and nutrient cycling."

Plaintiffs complained that the draft EIS, in considering coverage in developed areas, failed to analyze the effects on streams and the nearshore of concentrating coverage. According to Plaintiffs, the draft EIS "fails to acknowledge studies that show that urban coverage is the most detrimental coverage and fails to analyze the impact of increased and concentrated urban coverage in the Basin."

Several commenters, including the California Tahoe Conservancy and representatives of the EPA, expressed concern about "the consistency between and coordinated implementation of" the TMDL, the proposed RPU, and water quality management.

The final EIS included TRPA's responses to all of the comments received during the public comment period. While generally concluding that the draft EIS was adequate, TRPA made several significant changes to the draft RPU in response to comments.

TRPA's "Master Response 3" addressed the California Attorney General's and Plaintiffs' comments criticizing the coverage standards established on a Region-wide basis and permitting transfers of coverage allowances between hydrologically related areas. TRPA's response described the relevant comments as expressing

> concern about the programmatic approach to coverage assessment presented in the Draft EIS, including the application of coverage standards on a Region-wide versus a parcel-by-parcel basis; potential undercounting of coverage by excluding consideration of some 'soft' coverage in the Basin; and the

differences in impact between hard and soft coverage.

TRPA explained that in response to these comments, it had decided, among other things, to continue to prohibit coverage transfers between hydrologically related areas, rather than to start allowing such transfers in the RPU. TRPA pointed out, however, that Region-wide, rather than parcel-by-parcel or sub-watershed scale analysis was appropriate because the RPU was regional in scope, and the Bailey method did not require parcel-by-parcel analysis.

In "Master Response 4," addressing comments on coordination between the RPU and the TMDL, TRPA explained that it had made changes. The final RPU "includes important new features that address the relationship between the Regional Plan and the TMDL, specifically in the use of the TMDL water quality improvement plan and TMDL reporting information in the re-certification of Area Plans . . . and revisions that create alignment in reporting requirements."

In other Master Responses, TRPA addressed the comments expressing concern about the effects of more concentrated development on water quality.

> [C]omments suggest that policies incentivizing additional concentration of development in community centers could have localized adverse impacts on water quality, including on nearshore and tributary conditions. Concerns are expressed that the Draft EIS analysis does not adequately account for the fact that community centers

are near the Lake, pollutant loading may be higher in community centers than in outlying areas, and BMPs may not be adequate to mitigate the impact.

TRPA stated its conclusion that the concerns were not warranted, describing the draft EIS as "adequate as presented," and stating that "policies that incentivize transfers of development and additional concentration of coverage in specific areas would not result in significant impacts to water quality." Nevertheless, TRPA made modifications to the draft RPU, which it said were required in order to "narrow the scope of changes to coverage policies." In addition, TRPA prepared a "Pollutant Load Reduction Model" ("PLRM") stormwater modeling simulation, used to estimate localized water quality impacts of concentrating development within community centers. It added the PLRM to the final EIS in order to better gauge the effect of concentrated development on the lake.

TRPA made other significant changes to the draft RPU as well. In response to comments on the impact of revised height and density allowances for community centers, the final RPU included more scenic protections. In response to comments about the feasibility of a program of incentives for the transfer of development rights from sensitive and outlying areas into designated community centers, the final RPU retained the transfer incentive ratios set forth in the draft RPU, but made revisions such as limiting allowances for alternative transfer ratios for Stream Restoration Plan Areas. TRPA also revised RPU provisions regarding banked assets such as development rights in order to strengthen regulation of their use. In response to comments about development on recreation-designated lands, TRPA revised the draft RPU to

reduce the areas to be re-designated and to require additional planning and regulatory approvals through Area Plan conformance review prior to any development on land designated "Resort Recreation." In connection with concerns about exhaust emissions caused by vehicles traveling additional miles because of additional development, the draft RPU was revised in several ways, including the establishment of additional limitations for the future expansion of community centers.

The California Attorney General had made significant critical comments about the draft EIS's reliance on BMPs that had failed to be effective in the past. The final EIS included a description of numerous efforts that were to be made to improve the situation. It concluded that "[b]ased on the current maintenance requirements and practices, education efforts, and enforcement requirements . . . , it is valid to assume that implementation of BMPs would be effective."

In response to comments about the approval process for Area Plans, TRPA made some changes to the draft RPU's provisions regarding approval of Area Plans. TRPA added an appeals process for all delegated projects, and it reduced the maximum size of projects that could be reviewed and approved by other agencies through an Area Plan.

In summary, in response to negative comments, particularly from the State of California and Plaintiffs, TRPA made material revisions to the draft RPU and the draft EIS. It retained the prohibition against coverage transfers between hydrologically related areas. It coordinated the RPU more closely with the TMDL. It cut back the proposed increases in maximum allowable coverage for redevelopment projects in community centers. It added more scenic protections, and it

cut back draft RPU provisions regarding development on recreation-designated land. It strengthened the process for revising Area Plans. TRPA, specifically in response to concerns about the concentrated effects of increased runoff, added the PLRM stormwater modeling simulation to the final EIS.

TRPA issued the final EIS on October 24, 2012. The final RPU was adopted by TRPA's governing board on December 12, 2012, and took effect on February 9, 2013. Plaintiffs filed this lawsuit in the federal district court on February 11, 2013. The district court granted TRPA's motion for summary judgment in April 2014, and these appeals by plaintiff environmentalist organizations followed.

This court has received amicus briefs in support of affirming the district court by (1) City of Lake Tahoe, El Dorado County, Placer County, California, Douglas County, Carson City and County, and Washoe County, Nevada; and (2) Lake Tahoe Community College, South Shore Chamber of Commerce, North Lake Tahoe Chamber of Commerce, Sierra Nevada Association of Realtors, Lake Tahoe Visitors Authority, Tahoe Douglas Visitors Authority, South Tahoe Alliance of Resorts and Barton Health. Perhaps most significantly, the California Natural Resources Agency and Nevada Department of Conservation and Natural Resources have filed a joint amicus brief in support of TRPA.

## STANDING AND RIPENESS

TRPA contends that Plaintiffs lacked standing to bring this challenge to the impacts from the concentration of development, and that their claims are unripe, because no increase in coverage had yet been approved pursuant to any

Area Plan. We disagree. Plaintiffs satisfy the injury-in-fact requirement for standing to challenge the EIS because they have concrete interests in the Lake Tahoe Region. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2010). Their challenge is ripe because any violation of the Compact or applicable environmental laws resulting from the RPU and EIS has already taken place; Plaintiffs did not need to wait for Area Plans to be approved before bringing this suit. *See id*. at 486.

## STANDARD OF REVIEW

We review the district court's ruling on summary judgment de novo. *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 578 (9th Cir. 2016). Since TRPA is not a federal agency, the Compact, and not the Administrative Procedure Act ("APA"), provides the applicable standard of review of TRPA actions.

Under the Compact, "judicial inquiry shall extend only to the questions of whether [TRPA's legislative] act or decision has been arbitrary, capricious or lacking substantial evidentiary support or whether the agency has failed to proceed in a manner required by law." Compact art. VI(j)(5). This standard is similar to review under the APA, which provides that a federal agency action must be upheld unless it is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)), *cert. denied*, 134 S. Ct. 948 & 950 (2015); *League*, 739 F. Supp. 2d at 1267.

## ANALYSIS OF PLAINTIFFS' CONTENTIONS

## I.  Localized Effects of Concentrated Development

Plaintiffs contend that the EIS violated Compact article VII(a)(2)(A) by failing to take a hard look at impacts on soil conservation and water quality in the localized "community center" areas where concentrated development is directed. We conclude that the EIS's analysis of the effects of concentrating development was not arbitrary or capricious, and sufficiently addressed significant environmental impacts of the RPU.

TRPA may not amend the Regional Plan unless it finds that the Plan, "as amended, achieves and maintains the [threshold standards]."  TRPA Code § 4.5; *Sierra Club*, 916 F. Supp. 2d at 1105.  Article VII of the Compact requires that "when acting upon matters that have a significant effect on the environment," TRPA must "[p]repare and consider a detailed environmental impact statement."  Compact art. VII(a)(2).  This EIS must include, among other things: "(A) The significant environmental impacts of the proposed project; [and] (B) Any significant adverse environmental effects which cannot be avoided should the project be implemented."  Compact art. VII(a)(2)(A)–(B).  The EIS required by the Compact is similar to the EIS required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C), and to the reporting required by the California Environmental Quality Act, Cal. Pub. Res. Code § 21100. Decisions under NEPA are authoritative.  *League*, 739 F. Supp. 2d at 1266, 1274; *see also Glenbrook Homeowners Ass'n v. Tahoe Reg'l Planning Agency*, 425 F.3d 611, 615 (9th Cir. 2005) (stating that NEPA does not directly apply to TRPA).  An EIS is a procedural requirement with two

purposes: (1) ensuring that agencies carefully consider information about significant environmental impacts, and (2) informing the public of relevant information. *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1102 (9th Cir. 2016); *Lands Council v. McNair*, 629 F.3d 1070, 1075 (9th Cir. 2010).

The draft EIS conducted a region-wide analysis of the impacts of increased coverage (meaning coverage of land with concrete, asphalt, etc.). The draft EIS stated:

> Incentivizing coverage transfers and redevelopment by allowing up to 70 percent coverage on high-capacity developed parcels in [community centers] would increase coverage in these target areas. However, the additional coverage allowed on [these lands] would be directly offset by coverage transferred from sensitive land or more than offset on an acre-for-acre basis by transfers from high-capability land, resulting in an overall reduction of coverage in the Region and, importantly, reduction of coverage from SEZs [Stream Environment Zones] and other sensitive lands.

The draft EIS concluded that the proposed RPU ("Alternative 3" of the five alternative actions analyzed by TRPA) would comply with the total allowable coverage for the Region as determined by the Bailey system and would have a "less-than-significant impact on coverage in the Region." The draft EIS also concluded that Alternative 3 would have a "less than significant" impact on water quality.

In response to comments on the importance of soil conservation at the local scale, TRPA explained that more localized analysis would be too speculative at that stage. The final EIS stated: "The Draft EIS evaluates coverage from a programmatic policy perspective, with a level of detail and degree of specificity appropriate to analysis of a Regional Plan; a parcel-by-parcel analysis would be neither feasible nor necessary." TRPA further explained that even sub-watershed analysis was infeasible because the agency would be "forced to speculate where specific future projects would be proposed and where coverage would be removed."

As the district court concluded, the RPU's general shift from the Bailey system, addressing coverage, to the TMDL model, aimed at water quality restoration, was within TRPA's discretion. *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (holding, in a NEPA case, that a court must be at its most deferential in reviewing an agency's scientific determinations).

Plaintiffs contend, however, that the EIS violated Compact article VII(a)(2)(A)'s requirement of environmental analysis by addressing only the general region-wide impacts of coverage changes, and failing to address the effects of concentrated development on local watersheds in community centers, where coverage is already high, even though Plaintiffs, as well as the California Attorney General, presented extensive evidence of these effects. Plaintiffs argue that they did not seek study of site-specific project impacts, but instead sought an analysis of the cumulative impacts of many projects over larger areas, such as watersheds or sub-watersheds. They contend that the public and decision makers had no opportunity to weigh tradeoffs between

cumulative impacts of local soil loss and any environmental benefits of concentrated development.

We can reject TRPA's analysis of the effects of concentrating development in community centers only if it is arbitrary or capricious. *See* Compact art. VI(j)(5). It was not. The final EIS adequately addressed concerns raised about the draft EIS. As to water quality, the PLRM stormwater modeling simulation, which was included in the final EIS, addressed localized effects on those parts of the lake near community centers. As described in the final EIS, the PLRM simulation developed for the TMDL, part of the water quality restoration plan approved by California, Nevada, and the EPA, took into account available information. It incorporated data "on land use types, impervious coverage, and BMP implementation to generate estimates of fine sediment, nitrogen, and phosphorus loading and stormwater runoff" in order to "estimate the relative changes in pollutant loading that could occur within community centers." With regard to water quality, the final EIS addressed effects of concentrated development on a localized scale similar to the one advocated by Plaintiffs. The final EIS adequately explained the basis for its conclusion that concentrating development in community centers would not result in more concentrated runoff. The final RPU also maintained the prohibition of transfers of coverage across watersheds. Under the TRPA Code and the final RPU, all transferred coverage must come from the same hydrologically related area. TRPA Code § 30.4.3.E.

The final EIS also adequately addressed effects on soil conservation. In studying the proposed RPU, a region-wide plan, TRPA was not required to perform site-specific analysis of impacts on soil conservation. As TRPA stated in response

to comments, evaluation of coverage at a more localized scale would occur, as part of the Area Plan process, prior to development taking place. *See Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014) (stating that agency must balance need for comprehensive analysis against considerations of practicality); *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800–01 (9th Cir. 2003) (holding that deferral of site-specific analysis was proper under NEPA for program-wide EIS), *clarified by* 366 F.3d 731 (9th Cir. 2004). In addition, as TRPA argues, the PLRM simulation includes soil conservation components.

Contrary to Plaintiffs' contention, the draft EIS addressed cumulative effects on biological resources. With regard to biological resources, the draft EIS also stated that Alternative 3, the RPU, "would result in increased permeability, reduced urban runoff, and commensurate improvements in water quality, soil conditions, and habitat for vegetation and wildlife." TRPA acted within its discretion in its choice of scientific methodology, *see Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1088 (9th Cir. 2013), and its organization and presentation of information in the EIS, *see Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1002 (9th Cir. 2013). TRPA was not required to conduct additional scientific studies to determine an environmental threshold for conservation of soil at a local or watershed level before analyzing the impacts of region-wide coverage changes. *See N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011) (stating that an agency is not required to address every possible scientific uncertainty). The EIS's analysis of the effects of concentrating development was not arbitrary or capricious, and did not violate Compact article VII(a)(2)(A) by failing to address significant environmental

impacts of the RPU. *See* Compact art. VI(j)(5); *Protect Our Cmtys. Found.*, 825 F.3d at 578.

## II. Best Management Practices

Plaintiffs contend that TRPA improperly assumed, without adequate analysis and hence in violation of Compact article VII(a)(2)(A), that BMPs would reduce water quality impacts of concentrated development under the RPU even though TRPA has a poor track record of enforcing BMPs. We conclude that the EIS's assumptions regarding BMPs were not arbitrary or capricious, and were supported by substantial evidence. *See* Compact art. VI(j)(5).

The TRPA Code provides that BMPs "shall be applied to all public and privately owned lands." TRPA Code § 60.4.2. BMPs are described in the 2012 Handbook of Best Management Practices, found in volume II of the Lake Tahoe Basin Water Quality Management Plan. TRPA Code § 60.4.2. The RPU requires the installation and maintenance of BMPs in accordance with the Handbook. The Handbook states that BMPs are practices "that reduce or prevent the pollutants of concern identified in the Lake Tahoe Total Maximum Daily Load (TMDL) and other pollutants from entering surface and ground waters." The TRPA Code provides for temporary BMPs for construction sites, permanent BMPs for construction projects (as a condition of project approval), and retrofit BMPs. TRPA Code §§ 60.4.3, 60.4.4.

The TRPA Code and Handbook have several provisions relating to maintenance and enforcement. The Code requires that "BMPs shall be maintained to ensure their continued effectiveness." TRPA Code § 60.4.9. The Code provides

that TRPA shall enforce BMP project compliance programs, including the implementation and maintenance of temporary BMPs on construction sites and the application of permanent BMPs on projects.  TRPA Code § 60.4.3.  The Handbook provides that BMPs "are designed to reduce the impacts of stormwater pollutants and increased runoff on Lake Tahoe's famed clarity.  Without regular maintenance, BMPs lose their effectiveness, resulting in increased runoff and discharge of pollutants to Lake Tahoe."  The Handbook acknowledges, however, that maintenance of BMPs is "frequently neglected."  Accordingly, the Handbook states that building permits will require a BMP inspection and maintenance plan as a condition of approval, and land owners and managers will be required to keep inspection and maintenance logs.

In its analysis of the effects of the RPU on water quality, the draft EIS concluded that the effects of increased coverage in community centers would be "less than significant" because the additional coverage "would be required to meet existing BMP standards to control potential increases in stormwater runoff and pollutant loading . . . , including maintenance requirements."  The draft EIS summarized existing policies regarding BMP requirements and stated that 34% of land parcels in the Tahoe Region had obtained a BMP Certificate by installing BMPs that met TRPA requirements.

The reliance on BMPs in the draft EIS drew critical comments.  The California Attorney General commented that the EIS "should disclose [the Region's] history of neglected BMP maintenance and disclose the impacts of its alternatives assuming that past patterns of neglect continue into the future."  Plaintiffs commented that for "longer term impacts related to increased coverage – more runoff and the increased pollutant loads from new construction – the alternatives that

allow more coverage need to have increased regulatory authority (and stable funding) for inspections and enforcement of coverage and BMP maintenance and operation requirements for . . . new projects."

The final EIS responded that steps had been taken to improve the situation and went on to explain what they were. The final EIS stated: "Based on the current maintenance requirements and practices, education efforts, and enforcement requirements summarized below, it is valid to assume that implementation of BMPs would be effective." The final EIS then listed TRPA Code § 60.4.9, BMP Handbook Chapter 6, a Home Landscaping Guide for Lake Tahoe and Vicinity, and a contractor's manual that is included in the curriculum of an annual BMP contractors workshop conducted by TRPA. The final EIS also stated that TRPA had received grant funding for BMP inspection, TRPA inspectors enforce temporary BMP maintenance during construction projects, TRPA had received grant funding for a residential BMP maintenance video, TRPA had received grant funding for the sending of BMP maintenance reminders, and there were pending grant proposals related to the enhancement of maintenance tracking. The final EIS further explained that the RPU encouraged the use of area-wide water quality treatment facilities, which could "lead to more efficient maintenance practices relative to conducting maintenance activities on many smaller and widely distributed parcels and sites."

TRPA thus contends on appeal that the EIS properly relied on BMPs and their effective implementation in support of its conclusion that concentrated development would have a less than significant impact on water quality. As TRPA points out, the 2012 BMP Handbook acknowledges past

failures in maintenance and incorporates that experience into updated BMP guidelines. For example, according to the Handbook, project permits require a BMP inspection and maintenance plan, and land owners and managers are required to keep inspection and maintenance logs. TRPA also cites the public outreach programs listed in the final EIS as part of the agency's efforts to improve BMP maintenance. *See San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Def.*, 817 F.3d 653, 660 (9th Cir. 2016) (holding that courts may consider responses to comments for confirmation that an agency has taken a "hard look" at an issue). We must conclude that TRPA did not act arbitrarily and capriciously in relying on its plan to better implement and maintain BMPs. *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015–16 (9th Cir. 2006) (upholding an environmental assessment for a timber sale under NEPA); *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099–1100 (9th Cir. 2003) (upholding a planned monitoring program for grazing under the National Forest Management Act because it was rational for the Forest Service to conclude that despite past failures, monitoring should continue).

Plaintiffs cite statistics regarding the relative lack of past success of TRPA's BMP retrofit program. As TRPA argues, however, the RPU provides incentives for redevelopment and thus is designed to move properties from TRPA's retrofit program into its mandatory permitting program for new development, which requires BMP maintenance plans and logs. TRPA reasonably relied on data in the record in concluding that despite the agency's imperfect past enforcement of BMP maintenance, the RPU would have a less-than-significant effect on water quality. *See Lands Council*, 629 F.3d at 1076–77 (upholding a forest plan under the National Forest Management Act). Plaintiffs cite *Friends*

*of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 589 (4th Cir. 2012), where the court invalidated an environmental assessment under NEPA because a boat speed limit that an agency had not enforced was insufficient assurance that a project's boating impacts on wildlife would be mitigated. In this case, TRPA provided significant assurances of future enforcement. TRPA's assumptions regarding BMPs were supported by substantial evidence and are entitled to deference. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, No. 14-15836, 2016 WL 4269899 at *9 (9th Cir. Aug. 15, 2016).

## III.    Costs

The district court awarded costs pursuant to TRPA Rule 10.6.2, which provides that any agency costs in the preparation of the administrative record for a legal action be borne by the plaintiffs. Plaintiffs contend that the rule unfairly makes them responsible for such costs even if they prevail. Plaintiffs, however, did not prevail before the district court, nor have they prevailed on appeal. Accordingly, we do not need to address whether TRPA Rule 10.6.2 is a statutorily-authorized exception to the general rule, set forth in Federal Rule of Civil Procedure 54(d)(1), that costs should be allowed to the prevailing party. Whether Rule 10.6.2 was authorized by Compact art. VIII is a question for another day. Because we affirm the district court's decision in favor of TRPA, the district court did not err in imposing costs, nor did it abuse its discretion in denying Plaintiffs reimbursement for certain costs. *See Kalitta Air L.L.C. v. Cent. Tex. Airborne Sys. Inc.*, 741 F.3d 955, 957 (9th Cir. 2013) (per curiam).

Plaintiffs' request for judicial notice is denied as moot.

**AFFIRMED.**